185 So.2d 324 (1966)
Ledell POWELL et al., Plaintiffs-Appellants,
v.
FIDELITY & CASUALTY COMPANY OF NEW YORK, the Baton Rouge General Hospital and Argonaut Insurance Company, et al., Defendants-Appellees.
No. 6602.
Court of Appeal of Louisiana, First Circuit.
April 4, 1966.
Bobby L. Forrest, of Forrest & Kiefer, Baton Rouge, for appellant.
Robert L. Kleinpeter, of Kantrow, Spaht & Kleinpeter, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
ELLIS, Judge.
This malpractice suit was filed as a result of the death of Florida Powell, who will hereinafter be referred to as decedent, and the death of the unborn child of said decedent on September 17, 1963. It is not seriously disputed that the cause of decedent's death was pulmonary edema brought on as a result of a transfusion of 1000 cc. of whole blood. Decedent was in her thirty-fifth week of pregnancy at the time and the child was delivered by post-mortem Cesarean Section. An unsuccessful effort was made to revive the infant, who lived for some thirty minutes and then died of anoxia. The plaintiff is Ledell Powell, decedent's spouse, who is suing individually and for the use and benefit of the four minor children who survived decedent.
Prior to trial, plaintiff made a settlement with the attending physician and his insurer, with full reservation of all claims against Baton Rouge General Hospital, its insurers, Argonaut Insurance Company and the two practical nurses who completed administering the transfusion in the physician's absence. These nurses were Mrs. Elaine Sunseri and Mrs. Bessie Bankston.
After a trial was had on the merits, judgment was rendered by the District Court absolving the nurses, the hospital, and their insurance company from any liability in the premises. Written reasons were given for this decision. Counsel for plaintiff perfected a devolutive appeal from the judgment.
Many specifications of error were set forth in the appellate brief of counsel for plaintiff. However, the issues are not numerous. Concisely stated, the main issues on appeal are:
1. Was the rate at which the blood was administered to decedent a proximate cause of her death?
*325 2. If so, were the registered nurses who administered the transfusion responsible in tort for the speed or rate at which the blood was given to decedent?
3. Were the registered nurses under a duty to observe decedent for any particular time after the transfusion was completed?
The cogent facts are as follows:
The physician in charge had attended Florida Powell since July 24, 1963, at which time he judged her to be 27 weeks pregnant. This physician had certain tests run on decedent during the 35th week of her pregnancy. These tests were a urinalysis and a blood test. It was determined by the blood test that decedent's hemoglobin count was 8.5. Without any further ado, decedent's physician had her checked into the emergency room at Baton Rouge General Hospital in order to administer a blood transfusion. The purpose of the transfusion was to attempt to correct decedent's anemic condition prior to the time she was expected to deliver.
The decedent's physician himself set the amount of blood to be administered to decedent at 1000 cc. and injected the needle and started administering the saline solution prior to the actual transfusion of any blood. He then set the stop cock on the saline solution at the desired rate and left. There is no proof in the record that he gave any specific, oral or written, instructions to either of the defendant nurses herein concerning rate of flow or the period of observation of the patient after completion of the transfusion. The head nurse, Mrs. Bankston, was placed in charge of the transfusion when the doctor left, but she was called away and Mrs. Sunseri took over. It was Mrs. Sunseri who actually connected the container of blood after the saline solution had been administered. Her unrefuted testimony is to the effect that when she connected the first unit of blood it began in a steady flow. She then set the rate of flow of the blood back to the same speed indicated by the stop cock which had been set by the attending physician. The next important point in the evidence is the return of the attending physician. He checked the patient in the emergency room at about 9:30 A.M. and then commented to Mrs. Bankston who was at the desk, "You've almost finished this first unit and you will soon be ready for the second unit". He also stated, "the blood is flowing nicely".
After administering the second unit of blood at the same rate, Mrs. Sunseri notified decedent's sister, who had accompanied decedent to the hospital, that the transfusion was completed. Decedent was observed for from five to fifteen minutes, which constituted the time necessary for decedent's sister to have the car brought to the emergency room door to pick decedent up. Decedent's only comment to Mrs. Sunseri was that her arm felt awfully tired. It appears from the record that this is not at all unusual after any transfusion.
Decedent's sister testified that decedent complained to her that she was "still dizzy" and walked out in a very unsteady manner. There is no proof that Mrs. Sunseri was either notified of this, or that she noted decedent's unsteady gait.
Shortly after this, decedent was brought back to the hospital suffering from pulmonary edema. She died despite all efforts to save her and her child, delivered by post-mortem Section, died also.
It should be noted that no autopsy was made in this case. Therefore, we must rely on medical opinion alone concerning the exact cause of death. The consensus of the several physicians who testified was to this effect. Women in the last stages of pregnancy usually have considerably more blood in their systems than they ordinarily would. Therefore, a transfusion of the amount of blood received by decedent, who was in the 35th week of pregnancy, should only be given after extensive tests. These tests were not made in this case. All testifying physicians agreed that the attack of pulmonary edema would most probably have *326 been brought on by the transfusion of 1000 cc. of blood into decedent's bloodstream, even though the rate of transfusion had been quite slow. The medical testimony in the record also indicates that the rapid rate at which the transfusion was given could possibly have contributed to decedent's death, also. We will assume, arguendo, that it did.
At this point it is important to review the trial court's findings. An except from its written reasons for judgment sums up its findings regarding the actions of the doctor and the nurses in this case:
"I believe that two or three pieces of evidence are of prime significance in the matter. First, the attending physician inserted the needle and started the rate of flow of the saline solution; he left the emergency room before the blood was commenced, but the testimony is clear that the flow was adjusted to the flow that he had established when he began the saline solution. I do not find that contradicted anywhere. Moreover, before the conclusion of the giving of the first unit, he returned to the emergency room, and he was bound to have known within a matter of two or three minutes how long it had taken to give the blood that was absent from the sack, and he stated that `you've almost finished this first unit and you will soon be ready for the second unit.' He further stated, and this is not contradicted, that `the blood is flowing fine,' as Mrs. Bankston said once, and then, as she said the second time, he said substantially that `the blood is flowing nicely.' I repeat, that is not contradicted; that he knew then the rate of flow of the blood; that he approved it; and that he knew, is bound to have known, the time that had transpired for the giving of almost all of the first unit. He left then and left it up to the nurses. Now I do not see any evidence that they were ever taught anywhere to be precise about the flow of blood, and certainly not as to the amount to be given to any patient. Nor did they have any instructions from the attending physician on that point. I call attention again to the fact that he was there and he knew how fast the blood was being given, and he expressed his approval of it. So far as the evidence shows the second unit was given in the same manner as the first."
The only evidence which in any way contradicts the trial court's findings of facts set forth above is the testimony of the attending physician. He testified that when he returned the first unit was about half full. This testimony was not accepted by the trial court, which relied upon and quoted from Mrs. Bankston's statement of facts. In the absence of manifest error, this court is bound by the District Court's findings of fact.
Now let us examine the law applicable in the case at bar. The recognized rule in Louisiana in regard to the duty of care owed by a physician to his patient was set forth in Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781, as follows:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case. Stern v. Lanng, 106 La. 738, 31 So. 303; Roark v. Peters, 162 La. 111, 110 So. 106; Comeaux v. Miles, 9 La.App. 66, 118 So. 786; Freche v. Mary, La.App., 16 So.2d 213; Brashears v. Peak, La.App., 19 So.2d 901; Wells v. McGehee, La.App., 39 So.2d 196. See also 70 C.J.S., Physicians and Surgeons, § 41."
This rule was extended to nurses also in the case of Norton v. Argonaut Insurance Company, La.App., 144 So.2d 249, and *327 Favalora v. Aetna Casualty & Surety Company et al, La.App., 144 So.2d 544. The rationale behind extending this rule to nurses was stated in the Norton case to be as follows:
"Although there have been instances in our jurisprudence wherein the alleged negligence of nurses has been made the basis of an action for damages for personal injuries resulting therefrom, we are not aware of any prior decision which fixes the responsibility or duty of care owed by nurses to patients under their care or treatment. The general rule, however, seems to be to extend to nurses the same rules which govern the duty and liability of physicians in the performance of professional services. Thus in Volume 70 C.J.S. Verbo, Physicians and Surgeons, § 41, page 946 we find the rule stated as follows:
"`* * * The same rules that govern the duty and liability of physicians and surgeons in the performance of professional services are applicable to practitioners of the kindred branches of the healing profession, such as dentists, and likewise, are applicable to practitioners such as drugless healers, oculists, and manipulators of X-ray machines and other machines or devices.'
"The foregoing rule appears to be well founded and we see no valid reason why it should not be adopted as the law of this state."
The attending physician's negligence is not at issue here since he has entered into a compromise settlement with the plaintiff herein. There is nothing in the record which in any way implicates Mrs. Bankston. We find her free of negligence at the outset. As regards Mrs. Sunseri's negligence, there are only two points upon which any liability could possibly attach to her. She adjusted the rate of flow of the blood several times. (However, it was unrefuted that these adjustments were always to slow the rate, rather than to speed it up.) The other point is that she observed the decedent for only a short period of from five to fifteen minutes following the transfusion.
After reviewing the record presented in this case in light of the applicable law, it is found that plaintiff has failed to prove that the nurse, Mrs. Elaine Sunseri, was guilty of contributory negligence in this case. The rate of flow, as well as the quantity of blood to be given the decedent, was set by the physician at the start. Both nurses used this rate as a guide. After administration of the saline and almost all of the entire first unit of blood, the rate of flow and the amount then transfused were approved by the attending physician. He again indicated that the second unit was to be administered. At no time did he request that decedent should be held for observation for any particular time following completion of the transfusion.
Plaintiff has failed to prove his case in the following respects. He has not shown that the nurses herein had any right or duty to change the rate of the flow of blood when once set by the attending physician. Nor has it been shown that they actually did so. To the contrary, the preponderance of the evidence is to the effect that they did not.
Plaintiff has also failed to prove that the defendant nurses had any duty or responsibility, without doctor's orders, to keep decedent under observation for a longer period than was done. It is interesting to note at this point that reaction can set it as late as twenty-four hours after a transfusion. The period of observation is at the discretion of the attending physician.
Plaintiff relies heavily upon the Norton case and the Favalora case, cited supra. However, each of these cases is inapposite. In the Norton case it was shown that the nurse cast in judgment was negligent in administering a drug with which she was unfamiliar. Knowing the dosage was high, she merely discussed her uncertainty with physicians who were on the ward. It was shown that she had a positive duty to confirm *328 the dosage and the route of administration, intravenous or oral, prior to administration thereof, if she was in doubt. In the Favalora case the floor nurse, who was made a defendant, failed to secure a clinical history on the plaintiff prior to sending her for X-rays. But for her negligence in this respect, the plaintiff might never have been injured. The distinction between these two cases and the case at bar are readily discernible.
For the reasons assigned, the judgment of the trial court is affirmed in its entirety and costs of this appeal are taxed to plaintiff.
Affirmed.