Bobby B. **THOMPSON**

v.

**UNITED STATES of America.**

Civ. A. No. 17997.

United States District Court,
W. D. Louisiana,
Alexandria Division.

Oct. 26, 1973.

---

Leonard Fuhrer, Neblett, Fuhrer & Broussard, Alexandria, La., for plaintiff.

Donald E. Walter, U. S. Atty., Robert Shemwell, Asst. U. S. Atty., Shreveport, La., for defendant.

NAUMAN S. SCOTT, District Judge:

This action arose from an accident which occurred on November 17, 1970 at the Veterans Administration Hospital in Alexandria, Louisiana. As a consequence of this occurrence the left little finger of the plaintiff must eventually be amputated. Made the defendant in this case is the United States of America pursuant to the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.

Plaintiff entered the Veterans Administration Hospital on November 16, 1970, the day before the accident, at about 3:00 P.M. with an orthopedic problem related to his knee, which he had originally injured approximately 14 years previously while in the service. When Thompson arrived at the hospital he was ambulatory. The knee had been causing additional pain and after an examination a decision was made to operate again.

Between the time that the plaintiff checked into the hospital and 7:00 A.M. the following morning, he was administered a variety of drugs. On the afternoon of November 16 at about 3:35 and again the same night at approximately 8:15, Thompson was given 1 grain of codeine to relieve the pain in his left knee.

At about 9:00 P.M. he was administered 100 milligrams of seconal to help him rest. Thereafter, at approximately 10:55 P.M. Thompson awakened having difficulty breathing normally and complaining of pain extending from the sternum under the left breast area and around the chest to the underarm area. The staff doctor on duty, Dr. Glen L. Scott, was notified of this complaint at 11:00, and at 11:05 the plaintiff was administered 75 milligrams of vistaril by intramuscular injection and 3¾ grains aminophylline by suppository. All of the above medication and complaints were duly recorded in the nurse's notes. (Exhibit P–2).

The following morning at approximately 7:00 the plaintiff was given a lab slip by Mrs. Ellen Smith, a practical nurse, and instructed to go downstairs to the lab for some tests. Thompson followed her instructions and walked to the lab unassisted, where he "fainted" while standing in line. This fall will eventually result in the amputation of the left little finger of the plaintiff.

Under the Federal Tort Claims Act, the United States is liable "for injury . . . caused by the negligent or wrongful act or omission of any employee . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus since the accident occurred in Rapides Parish, Louisiana, the applicable law in this action is that of the State of Louisiana.

It is a basic principle of tort law that for a person to be guilty of actionable negligence, he must have breached some duty to another, causing damage to such other person. In the instant case, plaintiff has alleged that he was injured by the negligence of Mrs. Smith, a VA nurse.

At the trial and in its brief, the plaintiff has contended that nurses are held to the same standard of care as doctors.

"As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case." Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, 782 (1953).

In support of its position the plaintiff has cited Thompson v. Brent, 245 So.2d 751 (La.App. 4th Cir. 1971).

■ Although the *Thompson* case seemingly holds that nurses are held to the same degree of care as that exercised by doctors, we find that this is not a correct interpretation of the law. The principle case relied upon in *Thompson* for this proposition, Norton v. Argonaut Ins. Co., 144 So.2d 249 (La.App. 1st Cir. 1962), clearly holds that nurses are held to exercise that degree of skill ordinarily employed under similar circumstances by members of the *nursing profession* in good standing in the same community or locality. *See also* Powell v. Fidelity & Casualty Co. of New York, 185 So.2d 324 (La.App. 1st Cir. 1966) and Favalora v. Aetna Casualty & Surety Co., 144 So.2d 544 (La.App. 1st Cir. 1962). One would only have to consider the differing educational background and the differing levels of responsibility and authority to realize the correctness of this conclusion. Thus the issue which must be determined in the instant case is, did Nurse Smith exercise that degree of skill ordinarily employed by members of her profession in good standing in the same community or locality, and did she use reasonable care and diligence, along with her best judgment, in the application of her skill to the case?

At the trial of this matter, it was established without doubt that the conduct of Dr. Scott fell below the degree of skill ordinarily employed under similar circumstances by members of the medical profession in good standing in the

Alexandria-Pineville area. Dr. J. Camerata, head of the medical and surgical unit at Central Louisiana State Hospital, and expert in medicine and hospital administration, testified that in view of the mixture and dosages of drugs administered to the plaintiff in the limited time interval, and taking into account the chest pains and the possible potentiating effect of the drugs, Dr. Scott should have specifically placed in the doctor's orders instructions limiting the plaintiff's movements and should have ordered that a warning sign be placed on the bed of the plaintiff. An examination of the hospital records reveals that no such order was entered restricting the movement of the plaintiff.

The primary dispute in this case however is the alleged negligence of Nurse Smith. The plaintiff in his complaint and at the trial contended that a sign was placed on his bed prior to the accident forbidding his ambulation unassisted. He alleged that he was instructed by Nurse Smith, despite the sign, and over his protest and the protest of others in his ward to go to the lab unassisted.

There was much controversy at the trial concerning whether there actually was a sign on the plaintiff's bed the *morning of the accident restricting his* ambulation, which was allegedly disregarded by Nurse Smith. The only finding which we make on this issue is that it seems certain that at some point in time prior to Thompson's knee operation there was a sign of some sort forbidding his ambulation unassisted. However, for the reasons set out below we find that even if there was no visible sign on the plaintiff's bed on the morning of November 17 Nurse Smith was still negligent.

■ In her testimony at the trial Nurse Smith readily admitted that she had examined Thompson's hospital records when she came on duty. She acknowledged that she had noticed dosages of drugs given during the limited time intervals and also that the plaintiff had

suffered chest pains. When Dr. Comerata was asked about the conduct of Nurse Smith, considering her knowledge of the drugs given, coupled with the chest pains suffered by the plaintiff, he testified that her actions in sending plaintiff to the lab unassisted fell below that degree of skill ordinarily employed by members of the nursing profession in good standing in the Alexandria-Pineville area. This opinion was also supported by Dr. Ted Lowery, an orthopedic surgeon.

Nurse Loe and Nurse Laird, two registered nurses who testified for the defendant at the trial, disagreed with the opinions of the doctors. They testified that if a patient has already been examined by a doctor and no restrictions have been placed on him, it would be beyond their duty and realm of responsibility to question the doctor's judgment. This argument would be more persuasive if the doctor had left affirmative instructions that the patient was ambulatory or if the patient had not protested that he was not ambulatory. There is ample evidence to establish that he did protest. His protests were ignored.

Defendant has contended that even assuming arguendo that Nurse Smith was negligent, her negligence was not the proximate cause of the accident. The plaintiff's burden of proof in an action under the Federal Tort Claims Act is the same as it is under the Louisiana law in any action for damages, i. e. to prove his case by a preponderance of the evidence, which merely means that the damage was more likely caused by defendant's fault than not.

"To meet the burden of proof required in civil cases, the circumstantial evidence need not negate all other possible causes, Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963), it need only prove the causal relationship be more probable than not, Weber v. Fidelity & Casualty Ins. Co., 259 La. 599, 250 So.2d 754 (1971). Further, the breach of duty need not be shown to be the sole cause of the injury; it is a cause—in fact of the harm to another if it was a substantial factor in bringing about or not preventing the harm that the duty was intended to protect against. Dixie Drive-It-Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962)." Vonner v. State Dept. of Public Welfare, La., 273 So.2d 252, 255 (1973). .

Accepting the premise that had plaintiff been in a bed or wheelchair and lost consciousness he would not have been injured, we find that Nurse Smith's negligent conduct in sending Thompson to the laboratory unassisted was the proximate cause of his injury, Favalora v. Aetna Casualty & Surety Co., *supra.*

## DAMAGES

Evidence was clearly adduced at the trial that the plaintiff had undergone three unsuccessful operations designed to stabilize the finger and prevent its constantly becoming dislocated and painful. Although the date of the first operation was not permanently established, it appears to have been performed following a hospital admission of December 10, 1970, only 10 days after Thompson was discharged following his knee operation. The diagnosis for the December 10 readmission shows "recurrent dislocation of proximal interphalangal joint left little finger." In this operation fixation was attempted with two metal appliances. Considerable hospitalization and outpatient treatment followed, until it was discovered that there was a definite non-union and a second surgical effort was made. This appears to have been done on or about April 27, 1971, at which time a piece of bone was taken from plaintiff's left elbow and inserted in the hope of fusing the joint so that it would not move. Pins were removed from this operation two months later, and it was discovered that the bone graft had not taken. Finally, it appears that he was readmitted on August 25, 1971, again had finger surgery

on August 31st and was discharged on September 3, 1971. This operation likewise failed.

As the hospital record reflects, Thompson was readmitted in February of 1973, was staffed by consulting orthopedic surgeons and the recommendation was made that the finger should be amputated. Dr. Lowery testified that the expense would be about $200, would involve some fairly substantial degree of residual disability of the hand, and would result in effective total loss of the finger, although the stump would be left in place. The disability would range from 5% to 15% depending upon the location of the amputation.

Dr. Lowery testified that considering the history, plaintiff's complaint for pain and disability were justified. Plaintiff and his wife both testified about plaintiff's constant pain and disability problem resulting from the finger injury. The various complaints of pain in the finger and the many pain medications prescribed are documented in the hospital record during those portions of the past two and one-half years that plaintiff spent in the hospital.

Since Thompson is going to eventually lose his finger he would have been better off had he had his finger amputated after the accident. By doing this he could have avoided about two and one-half years of suffering and three unsuccessful surgical operations. However, it was not known at the time of the injury that the finger would not ever mend, and these extensive procedures were endured by the plaintiff in hopes of saving his finger.

Neither the VA hospital nor its staff are responsible for the failure of the operation but they are consequences of the original injury and must be taken fully into account in assessing damages. Thus in view of the prolonged period of two and one-half years, during which plaintiff has continually suffered pain and disability with the finger and has undergone three painful operations, involving considerable hospitalization, we feel that plaintiff is due an award of $12,000.00.

Plaintiff should submit a judgment for execution in accordance with Local Rule 9(e) of this Court.