REGAN, Judge.
The plaintiff, William R. Berry, filed this suit against the defendants, Gulf Coast Construction Company and its liability insurer, Westchester Fire Insurance Company, endeavoring to recover the sum of $150,000.00 representing damages for personal injuries incurred when a loose sheet of corrugated steel roof decking was blown by high winds from the roof of the Folger Coffee Company’s warehouse and struck him on the head. The plaintiff asserts that the cause of his injuries was the negligence of the principal defendant’s employees in failing to properly secure on the roof of the warehouse several bundles of metal decking on the day of the accident.
The defendants answered and denied the foregoing accusations of negligence and asserted that, in any event, they were not liable to the plaintiff.
The United States Fidelity and Guaranty Company, the workmen’s compensation insurer of the plaintiff’s employer, Fruin-Colnon Contracting Company, intervened herein endeavoring to recover compensation paid or to be paid to the plaintiff.
Following a trial by jury, judgment was rendered in favor of the plaintiff awarding him $77,900.00 and the intervenor, United States Fidelity and Guaranty Company, was awarded $2,989.73 to be paid with priority from the sum awarded to the plaintiff. Expert fees in the amount of $1,182.-60 were also taxed as costs against the defendants. From that judgment, they have prosecuted this appeal.
*370 The record discloses that the plaintiff, William R. Berry, was employed as a general engineer for the purpose of operating a crane by the Fruin-Colnon Contracting Company, the general contractor engaged in construction work at the Folger Coffee Company in the City of New Orleans. The Inland Steel Corporation entered into an agreement with Fruin-Colnon Company to furnish and install metal roof decking; however, Inland subcontracted the installation of the metal roof to Gulf Coast Construction Company.
On January 23, 1968, Berry was waiting on the premises of the Folger Coffee Company for delivery of the crane which he was to operate there. While walking in the vicinity of the warehouse upon which Gulf Coast Construction Company was erecting a sheet metal roof, he observed Howard Durni, a safety engineer for Fruin-Colnon Contracting Company, applying an oxygen mask to the face of Michael Beaugez, an employee of Gulf Coast Construction Company, who had fallen or was blown from the roof of the warehouse while endeavoring to secure loose metal roof decking which was being carried away by the high wind, which had attained a velocity of 20 to 25 miles per hour with gusts up to 30 to 35 miles per hour. Berry had just walked forward to offer his assistance when four or five sheets blew from the roof, and one, about ten feet in length and thirty inches in width, struck him on his head, knocking him to the ground and rendering him temporarily unconscious, even though he was wearing a safety hat.
Immediately after Berry was struck, A. Richard Tavares, general superintendant of Fruin-Colnon Contracting Company, climbed upon the roof and observed several bundles of roof decking banded and one or two loose with bands cut and some sheets laying loose. He described the sheets of metal as being 10 to 16 feet in length and 32 inches in width, and he estimated the weight of the 10 foot sheets to be 30 to 40 pounds and those 20 feet to weigh 60 pounds. He stated that the sheet which struck Berry was about 10 feet in length. He instructed Paul Sause, the iron worker superintendent, to escort his crew to the roof and tie down any loose sheets which they observed.
Fred McCoy and Ezell Morris, who climbed upon the roof to secure the loose decking, testified that there were eight bundles, five of which were fastened with metal banding and three had no lashing. McCoy testified that approximately eight sheets were loose, either all the way off the stack or falling off the stack, and there was no rope or wire on the roof to secure the bundles, so it was necessary that he have one of the crew obtain rope for that purpose and while waiting for the rope, it was necessary for himself and Morris to hold the sheeting in order to prevent it from being blown off of the roof by the force of the wind.
Shelby Harris, who was a witness for the defendant and one of its employees, stated that it was the general practice in the evenings to tie all bundles up if they were loose and to secure the sheets with timbers. He explained, however, that he assumed this was done the night before the accident, but he did not actually recall tying them down himself.
Kenneth Mayo, another employee of the defendant, also related that it was the usual practice to tie the loose bundles with rope and wire, but that he did not have a clear, independent recollection of this having been done.
The foregoing elucidation reveals that only questions of fact were posed for the trial court’s consideration. After hearing the evidence, the jury was convinced that the proximate cause of the injuries incurred by Berry was the negligence of the defendant’s employees in failing to properly secure the loose metal decking which was blown from the roof of the warehouse by the high wind striking the plaintiff on the head and causing his injuries.
*371 The question which this appeal has posed for our consideration is whether that finding by the jury was so erroneous and unsupported by the evidence adduced herein so as to warrant a reversal by us.
We are of the opinion that no useful purpose would be served by indulging in a laborious discussion of the voluminous testimony or by endeavoring to reconcile the respective litigants’ versions of the condition of the metal decking and the manner in which the accident occurred. The jury accepted the plaintiff’s version thereof, and our analysis of the record convinces us that the evidence preponderates in his favor, and the judgment is, therefore, correct.
With respect to quantum, the record discloses that the plaintiff, a man sixty-seven years of age at the time of the accident, incurred the following injuries as the result thereof: a cerebral concussion, severe cervical and upper thorasic sprains, bilateral fractures of each first rib near the vertebral articulation, a bilateral nerve type hearing loss and permanent damage in the right labyrinthine balance mechanism of the right inner ear as revealed by electronystag-mography tests, loss of balance and blackouts requiring the plaintiff to have constant attention and totally incapacitating him from pursuing his occupation as an operating engineer.
Berry was initially treated on the day of the accident and two days thereafter at an industrial clinic operated by Dr. Rudolph J. Bourgeois, who examined him and hospitalized him between the dates of January 26, 1968, and February 6, 1968. He complained that he experienced aching in his head, neck and back, dizziness and faintness which persisted to the date of the trial which, of course, prevented him, in the meantime, from returning to work.
Dr. Richard Levy, a neurosurgeon who examined Berry at the request of the compensation insuror and Dr. Bourgeois, his treating physician, testified that when he examined him one month prior to trial, which was eleven months after the accident, he found him still suffering from the cerebral concussion and he had symptoms of dizziness and headaches, and could not perform even the simplest test such as placing his feet together and closing his eyes without swaying or falling. He expressed the opinion that this condition would probably be permanent.
The testimony of the otolaryngolo-gists is uncontradicted to the effect that Berry has received permanent damage to the balance mechanism of the right inner ear which will cause him to suffer from true vertigo and blacking out for the remainder of his life. For these physical injuries and the pain and suffering resulting therefrom, the jury awarded the plaintiff the sum of $40,000.00, which, in our opinion, is not excessive.
To reiterate, the plaintiff, prior to the accident, was regularly employed as an operating engineer specializing in the operation of large cranes which the record discloses require great skill. His 1966 and 1967 income tax returns reveal that he earned an average yearly salary of $7,436.-08. The jury awarded the plaintiff approximately one year’s salary without discount and an additional three years of future salary discounted at 6%. We are convinced that this award was also correct.
The plaintiff’s wife, prior to the accident, was employed as a saleslady, and earned the sum of $2,600.00 annually or about $216.67 per month. She was compelled to terminate her employment in order to care for her husband after the accident. The jury awarded lost wages for one year in the amount of $2,600.00 and three years of future lost wages in the amount of $7,-800.00. The medical testimony is to the effect that the plaintiff will require care for at least this period and perhaps longer, and therefore the jury was correct in making this award.
*372 The defendant contends that under Louisiana law there exists an obligation of both husband and wife to render personal care to an ill or infirmed spouse for which services the spouse is not entitled to an allowance, and if the injured party’s spouse terminates employment to care for the injured spouse, that spouse is not entitled to recover for loss of income. The defendant cites Covey v. Marquette Casualty Company[1] in support thereof; however, in our opinion, the rationale emanating therefrom does not support this contention. In that case, Covey sought to recover $250.00, the total amount of a daily wage of $3.00 he insisted he paid a maid to care for his wife during her illness. We stated that we were not satisfied with Covey’s testimony that such expenditures had actually been made, and the request was refused. He also sought to recover $280.00 for his lost salary over a two week period during which time he remained away from work in order to care for his wife. We were convinced that he should have made other arrangements for her care, and we would not permit recovery. In that case, we never even indicated that recovery could not be obtained where the proof which was offered is conclusive to the effect that circumstances were such that one spouse was actually required to terminate his or her employment with the resulting loss of income in order to care for the other spouse.
In the case of Greenberg v. New Orleans Public Service,[2] the wife was awarded damages which were incurred as the result of relinquishing her employment at a salary of $315.00 per month in order to operate a service station for her husband during his disability. Where proof exists that the incapacity of one spouse necessitates the other’s termination of employment with loss of income in order to care for the ill spouse or to operate his business, the tortfeasor shall not be permitted to escape liability for such lost wages caused by his negligence by simply relying on the obligation imposed by law on each spouse to care for the other. The income of the spouses is community property, and one-half of the lost wages belong to the incapacitated spouse in conformity with the rationale encompassing the community property law of Louisiana.
For the reasons assigned, the judgment appealed from is affirmed.
The defendants are to pay all costs incurred herein.
Affirmed.

. La.App., 84 So.2d 217 (1956).

. La.App., 74 So.2d 771 (1954).