Harold Otis WRIGHT and Audrey
Wright

v.

UNITED STATES of America.

Civ. A. Nos. 76–673, 76–800.

United States District Court,
E. D. Louisiana.

Opinion on Liability March 4, 1980.
Opinion on Damages Jan. 6, 1981.

148

George M. Papale, Knight, D'Angelo & Knight, Gretna, La., for plaintiffs.

John P. Volz, U. S. Atty., Joan Elaine Chauvin, Asst. U. S. Atty., New Orleans, La., for defendant.

HEEBE, Chief Judge.

The above-captioned malpractice suit was tried to this Court, with the Court as trier of fact, as a bifurcated trial litigated first on the issue of liability. It is asserted that because of negligent treatment by physicians and nurses at the Veterans Administration Hospital in New Orleans, Harold Otis Wright suffered cerebral anoxia which resulted in brain damage. This brain damage has left Mr. Wright a spastic quadriplegia with diminished visual acuity bilaterally, i. e., legally blind. Plaintiffs allege the following specific acts of negligence: (1) failure to administer the drug Epinephrine in fractioned dosages to Mr. Wright upon admission and examination by the first doctor; (2) performing an attempted intubation on Mr. Wright while he was sitting in a wheelchair; (3) repeatedly attempting to intubate him in the face of resistance from his vocal cords; (4) using an endotracheal tube which was the wrong size; (5) performing a more classical tracheostomy rather than a penknife tracheostomy, which would have taken much less time than the elected procedure; (6) failure to have an ambu bag on hand which could be connected to the tracheostomy tube.

As noted on Mr. Wright's admittance form under the heading "Medical Certificate and History," Mr. Wright was admitted to the Veterans Administration Hospital at 7:34 p. m. on April 26, 1973, and was diagnosed as suffering from acute laryngeal edema, with a pulse rate of 116 and blood pressure of 230 over 100. It was noted, on this form, that he was a 31 year old veteran, who on admission (per ambulance) had difficulty breathing and was in acute distress. He was treated as an emergency admission, a patient whom the initial attending personnel were unable to put on a litter, but who was subsequently lowered to the floor by the two treating physicians and two nurses. He suffered respiratory arrest and a tracheostomy was performed on the floor. An admission entry on the form indicates that the physician on duty administered 10 milligrams of Decadron intrave-

nously. It later appeared from the depositions and subsequent testimony of the persons involved in the treatment given Mr. Wright that this report was filled in after the fact. The nurse who wrote the information down did not remember all of the facts and some of the facts stated thereon are in dispute. The following facts found by this Court indicate the version of the incident which the Court adopts.

Before going into the facts of this case, we note that plaintiffs seek to account for and analyze every minute of time that transpired from the moment Mr. Wright arrived in the emergency room of the VA Hospital until he started to ventilate himself after a tracheostomy was performed on him. The Court finds that because this was an emergency situation, one in which the patient was admitted in acute distress, the exact time lapse is not known, was not accurately noted and cannot now be precisely defined. The Court will therefore proceed to use the noted times as the best estimate that could be given in retrospect. In addition, without implying that a specific expertise is needed in an emergency situation, we feel that it should be kept in mind that this plaintiff was treated under emergency conditions without the benefit of calm reflection and deliberation, as well as hindsight.

### Facts of the Case

On April 26, 1973, Harold Otis Wright went to his doctor's office, accompanied by his wife, to be checked for a sore throat which he had had for approximately two days. His family doctor, Dr. Fontenelle, examined him and diagnosed the cause of his sore throat as the result of tonsillitis or a strep throat. Prior to prescribing any medication for Mr. Wright, Dr. Fontenelle made inquiry as to whether or not he was allergic to penicillin. After Mr. Wright answered that he did not know, he prescribed V-Cillin-K, oral penicillin, and "Citra Syrup" and instructed him to take two penicillin tablets every two or three hours for five doses the first day and then one tablet four times daily thereafter. After the prescription was filled later that day, Mr. Wright took two penicillin tablets with soda before leaving the drugstore. Mr. Wright took one or two more doses of the medication prescribed by Dr. Fontenelle later that day and evening. At approximately 7:00 p. m. that evening, Mr. Wright ran from his bedroom, through the back door and into the yard. He tore off his shirt and made loud, audible noises with each breath he took and slapped at his throat. When his wife reached him, she saw that he was unable to talk and was having difficulty breathing. With Mr. Wright's approval, she called for an ambulance, which was dispatched at 6:59 p. m. and arrived approximately ten minutes later at the Wright's home. Upon attempting to walk to the ambulance, it was noted that Mr. Wright's knees were buckling. Thereafter, with the assistance of the ambulance driver and his brother-in-law, who had also been summoned, Mr. Wright was placed on a stretcher and wheeled into the rear of the vehicle. Mr. Wright was still making loud noises and appeared anxious and afraid.

After Mr. Wright was placed in the ambulance, the driver handed Mrs. Wright, who climbed into the ambulance after Mr. Wright, an oxygen mask with instructions to place it over Mr. Wright's face. Mrs. Wright then directed the driver to take her husband to the Veterans Administration Hospital in New Orleans. The Wright's home was in Violet, Louisiana. It took approximately thirty-five minutes from the time the ambulance was called until Mr. Wright was in the VA Hospital, 7:34 p. m. having been noted as his time of arrival on the admitting slip. Although there is conflict in the evidence as to whether the administered oxygen completely controlled Mr. Wright's convulsive breathing (medically termed stridor), it appears that he was somewhat calm in the ambulance. However, the Court does not believe that the oxygen effectuated a complete cessation of the loud and difficult breathing because of doubts expressed by various doctors coupled with testimony from the ambulance driver that some noise was still audible above the engine and in spite of the mask covering Mr. Wright's face. Moreover, Mr. Wright's

loud, difficult breathing was audible to the admission room nurse, Mrs. Aubert, at the VA Hospital before she saw him, that is on his way into the room. Consequently, she promptly put an oxygen mask on him as soon as he entered the room. Mrs. Aubert, who was the staff nurse assigned to the admit room, also saw that Mr. Wright was in apparent respiratory distress. She immediately called the medical officer of the day. She also signaled a "Code 6," which in this hospital denoted an emergency, making it clear to the Court that the seriousness of this man's condition was immediately visible. The medical officer, Dr. Lutz, arrived in the room approximately a minute or two after being summoned by Nurse Aubert, saw Mr. Wright seated in a wheelchair and also noted at once that he was in apparent respiratory distress. Dr. Lutz, who was at that time a Tulane University Internal Medicine resident with two and a half years of training behind him, was doing a three month rotation at the VA Hospital in the hospital's pulmonary service.

After arriving in the emergency room, Dr. Lutz observed Mr. Wright sitting in a wheelchair, experiencing inspiratory stridor. He had been left in the wheelchair because he was a fairly heavyset man who became combative upon physical contact. Nurse Aubert was not able to move him to a prone position. Dr. Lutz proceeded to do a number of things. However, the exact order in which each was done is not determinable. He examined Mr. Wright's throat and chest and determined that there was no foreign body in his throat and that his great difficulty in breathing did not amount to respiratory arrest. It seems quite clear to the Court that although Dr. Lutz has described Mr. Wright as "alert" when he saw him, this description was picked up after the fact, at some later time when he was being questioned about the incident. From the obvious condition that Mr. Wright was in, his distress being immediately discernible to anyone who heard or saw him, "alert" could mean nothing more than that he was still conscious. After examining Mr. Wright, Dr. Lutz replaced the oxygen source which he had removed in order to undertake the examination. It is not certain whether he put back the face mask or used a nasal canula. However, oxygen was reinstituted. After receiving a brief history from Mrs. Wright, which included the fact that Mr. Wright had been prescribed and had taken oral penicillin, Dr. Lutz diagnosed his condition as laryngeal edema, probably caused by an allergic reaction to penicillin. He administered 10 milligrams of Decadron intravenously to Mr. Wright and, after being with him for only four or five minutes, determined that his condition was serious enough to require an immediate tracheostomy. This decision is yet another indication to this Court of just how alarming Mr. Wright's condition appeared at the time. Dr. Lutz noted that Mr. Wright had a short, thick, muscular neck, which meant that any tracheostomy performed on him would be difficult, especially since he was also agitated and combative. He, therefore, called for the surgical officer on duty, Dr. John M. Jones.

After completing one year of an internship in surgery following graduation from medical school, Dr. Jones was in his residency training in neurosurgery at the VA Hospital. When Dr. Jones arrived, Mr. Wright was still sitting in the wheelchair, having great difficulty breathing. Upon stethoscoping him, Dr. Jones ascertained that Mr. Wright's breathing was faint. Moreover, he noticed that his complexion was ashen gray, indicating that Mr. Wright was becoming hypoxic. Dr. Jones elected to laryngoscope Mr. Wright in order to attempt an intubation with an endotracheal tube before attempting a tracheostomy, the more drastic procedure. Dr. Jones had also diagnosed Mr. Wright's condition as laryngeal edema. However, his diagnosis was made on the basis of the appearance of Mr. Wright's vocal cords, which were swollen, red, edematous and barely open. He was not interested in the cause of the edema as much as he was in establishing an airway in this patient. However, on attempting an endotracheal intubation, he found that the opening was so small that he could not get the endotracheal tube through the vocal cords

even though he was using the smallest tube available. During the time Dr. Jones was trying to intubate him, Mr. Wright was agitated, struggling and thrashing about. The attempts at intubation took two or three minutes, with Mr. Wright still sitting in the wheelchair. After about the second try, Mr. Wright went into respiratory arrest. After Mr. Wright collapsed, it took four persons—both doctors, Nurse Aubert and a male nurse who came into the room after Dr. Jones—to lower him to the floor.

The Court finds that after Mr. Wright was placed on the floor, Dr. Jones initiated the tracheostomy procedure. This was about four minutes after he had first seen Mr. Wright, who was now comatose. In doing the tracheostomy, Dr. Jones had to be more careful than usual because in a short, stubby neck such as Mr. Wright had, the blood vessels are compressed, and it is more difficult to avoid the large vessel, which, if punctured, could cause the patient to bleed to death. This is coupled with the fact that this emergency procedure could not compare to normal surgery. Dr. Jones performed a classical tracheostomy in about ten minutes. According to him, it took this amount of time because it was an emergency as compared to the twenty to thirty minutes which would have been taken for an elective tracheostomy. Dr. Jones cut through the cartilaginous ring in the neck in a horizontal and transverse fashion in order to open the trachea. According to him, and the Court so finds, this was successful and there was a gush of air heard from Mr. Wright's lungs. A trach tube was then inserted which bypassed the edema in the vocal cords, and the patient was now breathing voluntarily.

*Standard of Care and Expert Witnesses*

To the average layman, the facts which this Court has found constitute the treatment rendered by Drs. Lutz and Jones to Mr. Wright at the VA Hospital on the evening of April 26, 1973, would appear to describe frantic emergency treatment. In order to prove their case, plaintiffs relied on the testimony of doctors who were not present at the time of the incident, but rather who gave their expert opinion as to the propriety of the treatment of Mr. Wright. This suit was brought against the United States under the Federal Tort Claims Act, pursuant to which the United States may be found liable "for injury . . . caused by the negligent or wrongful act or omission of any employee . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Thus, since the accident occurred in Orleans Parish, Louisiana, the applicable law, as all parties readily agree, is the law of Louisiana. *See Thompson v. United States*, 368 F.Supp. 466 (W.D.La. 1973). In reviewing Louisiana's medical malpractice statute, La.R.S. 9:2794, the Louisiana Supreme Court recently overruled a 1954 decision and held that the statute requires a medical specialist ". . . to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty; that the plaintiff seeking to prove that a medical specialist failed to adhere to these standards of care or skill is not limited to expert medical testimony by witnesses practicing or familiar with the standards of care and skill within the defendant specialist's community or locality . . . ." *Ardoin v. Hartford Acc. & Indem. Co.*, 360 So.2d 1331, 1340 (La. 1978); *Samuels v. Doctors Hospital, Inc.*, 588 F.2d 485, 488 (5th Cir. 1979). As to the burden of proof with respect to causation, the court in *Ardoin, supra* at 1334, further stated that: "The statute further requires that in order to recover a patient must also prove that he suffered injuries proximately caused by the defendant's lack of knowledge or skill or the failure to use reasonable care and diligence, along with his best judgment." Although all of the doctors called by both plaintiffs and defendant as expert witnesses practice their specialty in the New Orleans area, none purported to limit their opinion of proper medical procedure under the circumstances to any particular locality. They spoke generally, relying on

knowledge and experience gained both in this area and elsewhere and also on nationally recognized medical writings. It actually is not clear whether the expert witnesses were called as specialists (which they each are) or to testify as to the standard of practice exercised by physicians in the same locality or community. However, as pointed out by the court in *Hemingway v. Ochsner Clinic*, 608 F.2d 1040 (5th Cir. 1979), by comparing defendants to the average specialist in the country, we have held plaintiffs to an easier burden of proof.

Dr. John Adriani was the chief medical witness for the plaintiffs. He was Chairman of the Department of Anesthesiology at Charity Hospital, New Orleans, from 1941 to 1975, and of the same department of Tulane University Medical School until becoming emeritus professor in 1974. He had been a full professor in the departments of anesthesiology and surgery at the Medical School of Louisiana State University and of the same departments, with the addition of pharmacology, at Tulane University Medical School. However, since 1941, his time was primarily spent in the area of anesthesiology. The government not only readily acknowledged Dr. Adriani's expertise in his fields but also the fact that his reputation is preeminent in the medical profession.

Given approximately the same facts, with minor deviations, as this Court has found, Dr. Adriani felt that the treatment tendered to Mr. Wright was clearly improper. Based on his conclusion that Mr. Wright was salvageable when he arrived at the hospital, because of the facts that he was sitting up and still able to breathe, Dr. Adriani strongly felt that the immediate line of treatment to deal with Mr. Wright's problem, an acute allergic reaction to penicillin, was to give him an injection of the drug Epinephrine. According to him, Epinephrine acts quickly on swelling and within one or two minutes Mr. Wright's swelling could have gone down. It is considered the drug of first choice in treating an emergency allergic reaction. It was Dr. Adriani's considered opinion that Dr. Lutz erred in not having thought to give Mr. Wright Epinephrine. Dr. Adriani felt that Decadron, the drug which Dr. Lutz did administer, was a drug of third choice, a steroid which is given when someone experiences a prolonged effect from an allergic reaction, an intractable case. By giving Decadron, Dr. Adriani felt that Dr. Lutz's medical judgment was improperly exercised because as a steroid it would have taken effect only after an hour or more, with its peak effect occurring two or three hours later. Although he would go so far as to say that there was a very slim possibility that Epinephrine would not have worked, he still felt that the order of treatment of patients such as Mr. Wright presented on admission to the VA Hospital was to give a vaso depressor, preferably Epinephrine. He expressed the opinion that this was standard knowledge of the average physician. Moreover, the second drug which would be administered in a case such as this would be an antihistamine and only third a steroid. Furthermore, in anticipation of testimony from defendant's medical evidence, Dr. Adriani responded to questioning as to adverse effects of Epinephrine that the benefit of using it as compared to the risk of it bringing on a heart attack, considering the patient's condition, was, in his mind, so disparate that one could not decide not to give Epinephrine. Moreover, he was emphatic that Epinephrine could not bring on a heart attack. He agreed that a patient could get arrhythmia with large doses but felt that would not apply to the dose one gives to relieve edema of a larynx. Dr. Adriani agreed that Epinephrine could cause palpitation but he felt this would not hurt the patient who initially did not have coronary artery disease, such as Mr. Wright.

Having stated that the first mistake made was in not giving Mr. Wright Epinephrine, Dr. Adriani felt that the second one was in attempting to intubate this patient in a wheelchair first and also while he was on the floor. He considered the situation further worsened by Dr. Jones when he traumatized the swollen larynx and threw it into increased spasm during the attempted intubation. Dr. Adriani estimated that

very few doctors are skilled at intubation and that this would not have included Dr. Jones. It should be noted that Dr. Adriani had not actually worked in an emergency room for quite some time other than on consultation. His objection to this procedure appeared to be that it was an awkward way in which to intubate a patient. After giving Epinephrine, he agreed that where the patient has a complete obstruction, the next proper procedure is to perform a tracheostomy to quickly open an airway but more correctly it should be a "pen-knife" type of tracheostomy.

Among the doctors called to controvert the testimony of those called by plaintiffs, Dr. Roy Clay stands out as the one on whom greatest emphasis was placed. Dr. Clay is a physician whose career has been with the Public Health Service and who has held the positions of Assistant Chief, Deputy Chief and Chief, Department of Surgery, at Boston and Chief, Department of Surgery at New Orleans. At this time, he was also a Clinical Associate Professor of Surgery at Tulane University Medical School in New Orleans. On both occasions when he had been qualified previously as an expert witness, it was on behalf of the Public Health Service Hospital. However, the Court is not of the opinion that Dr. Clay was prejudiced in favor of the government and could not testify honestly. With this in mind, the Court notes that Dr. Clay has been closely involved with emergency room care and has experience in the treatment of patients with allergic reactions, including those with allergic reaction to penicillin. Although the government seeks to cloud the conclusion by hypotheticating other alternatives, the Court is convinced that from the information made available to him, it was also Dr. Clay's opinion that Mr. Wright had some form of anaphylactoid reaction due to an antibiotic he had ingested.

Having pointed out that an anaphylactic type reaction to oral penicillin is extremely rare, Dr. Clay stated that most reactions to the drug occur from injectable penicillin usually within fifteen minutes of the injection and usually in a situation where the patient is fairly accessible to a doctor. In such a case, he agrees that immediate drug therapy is mandatory. Furthermore, he states that as a rule of thumb Epinephrine is the drug of first choice where the acute situation of anaphylactic reaction is accompanied by laryngeal edema. Dr. Clay recounted, however, that on at least three occasions when he had given Epinephrine within fifteen minutes of the reaction, trouble with the airway was not eliminated and a tracheostomy was still necessary. The Court does note that Dr. Clay could not state a situation where he did not, in fact, first give Epinephrine just in case it proved effective.

Dr. Clay made two significant points. First, he was of the opinion that the longer the time which elapses following an anaphylactoid reaction, the less chance there is for drug response, and after twenty minutes, there would probably be no response to any drug. According to him, in full blown laryngeal edema, which would occur in twenty minutes, Epinephrine no longer has an effect on the swelling. The reason he gives for this opinion is that Epinephrine can only stop further release of allergens which cause the edemous condition; it cannot reverse the swelling that already exists. On the other hand, if it is administered at an early stage in the swelling process, it is possible that it would stop the release of tissue allergens and additional swelling. This opinion was based solely on personal experience. Since Dr. Clay was of the opinion that no drug would have helped Mr. Wright twenty minutes or so after the reaction, he was of the opinion that administering the drug Decadron caused no harm even though he would not have given it. Second, it was Dr. Clay's opinion that the use of Epinephrine was contraindicated by the patient's condition. And he felt that there would be a risk in giving a hypoxic heart this drug because, if it did not clear up the airway problem, it might precipitate cardiac arrest and create an even greater problem. However, here too, he opined that although he would not have given it under the existing conditions, he would not have considered it wrong for a doctor to do so as it

was a matter of medical judgment. It was pointed out, however, that the 1973 Physician's Desk Reference cautions that the drug Epinephrine may be contraindicated with respect to elderly persons, persons with cardiovascular disease, diabetes, hyperthyroidism or high blood pressure, but in such cases it indicates that the drug should be administered with caution. In administering the drug with caution, there are procedures whereby it is given in fractioned dosages. Even when pressed to give an opinion as to the effectiveness of Epinephrine on a patient who has been able to sustain himself for at least forty minutes or more on oxygen-assisted breathing, given high blood pressure and rapid pulse, Dr. Clay still rested on these conditions as contraindicating its use. He estimated that one dose could have raised Mr. Wright's blood pressure even higher. He, of course, agreed that Epinephrine physically could have been administered intravenously to the patient instead of Decadron at that time.

With respect to the medical soundness of the decision to attempt to intubate a patient who is in acute respiratory distress as a result of laryngeal edema, Dr. Clay considered this to be a matter of medical judgment in a medically controversial area. He, for example, felt that the first thing he would have done was to attempt to put in a trachea tube to establish an airway. He held this opinion even though he was aware that, if the attempt at intubation did not succeed, the patient's airway generally will close. With respect to the manner in which Dr. Jones attempted to intubate Mr. Wright, Dr. Clay recounted that he had intubated many patients while they were sitting in a chair because it was the most expeditious and safest thing to do for the patient at that time. This included patients with laryngeal edema. Dr. Clay conceded that this was not the ideal procedure, as opposed to a patient lying quietly on a table and properly elevated and prepared, but one which was indicated with a patient who has obvious respiratory stridor, is combative and in need of oxygen on the way to the hospital, combative when he arrives at the hospital, and whose vital signs are noted at the hospital as blood pressure 230 over 100, pulse 116, marked shortness of breath and acute distress. In such a case, he does not believe that an intubation can be done by lying this patient down. It should also be emphasized by the Court that, with respect to Mr. Wright, the nurse could not get him to lie down on admission and it took four people to place him on the floor after he became unconscious.

Three other doctors called by defendant —Drs. Van Meter, Moore and McSwain— supported Dr. Clay's position that Epinephrine either would not have helped or was contraindicated. Dr. Keith Van Meter, Director of the Emergency Department at the Jo Ellen Smith Memorial Hospital in New Orleans, agreed that normally Epinephrine is the drug of first choice with laryngeal edema. However, he felt that its use was extremely dangerous on an anoxic patient. In addition, he was of the opinion that there is a point at which edema becomes "fixed" and at which Epinephrine, or like drugs, will not have the desired effect. Although he had experienced at least one case with problems similar to those detailed here, he had still seen fit to administer proper dosages of Epinephrine, Benadryl and Decadron, with follow-up dosages, which is the sequence stipulated by Dr. Adriani, even though it did not produce the pharmacologic effect sought with respect to the patient involved. With regard to the other areas of alleged malpractice, Dr. Van Meter emphasized that there is tremendous tension on a physician in an emergency situation as existed in this case. Moreover, he agreed with what the treating physician had done, that is, proceeded immediately to open an airway. He claimed to have at least on one occasion intubated a patient in a sitting position. He felt it was proper to attempt an endotracheal intubation in an emergency situation before doing a tracheostomy. With regard to the issue of whether an attempt at a forced intubation was at all proper because of risk of exacerbation of the edema, he felt that it is very much indicated if it appears at all possible

that the intubation can be done. Accordingly, he felt one must believe that a doctor who attempts it has seen the vocal cords and feels that passage of an endotracheal tube is possible. Moreover, he was of the opinion that since it is so desirable to have a tube in place, especially if the doctor is not experienced in doing a tracheostomy, it is worth taking a chance where the patient is greatly obstructed to begin with and the alternative involves cutting another vessel. As far as Dr. Van Meter was concerned, these two doctors were faced with a rare emergency episode which did not repeat itself on a day-to-day basis in their practice of medicine. He felt that they performed admirably and that not only was it unfair to say, as Dr. Adriani had, that Mr. Wright was salvageable when seen, but he could not speculate whether he could or could not have saved him. However, he did not view this as the relevant question in this matter, but rather the question of whether the doctors in attendance performed properly given the norm in medical practice at the time. He did not hesitate to conclude that they had done well.

Dr. Wandry Moore, Assistant Chief of Medicine, Chief of Allergies and Rheumatology at the U. S. Public Health Service Hospital in New Orleans, also testified for the government. He, too, agreed that when a patient has a local reaction which causes edema of the throat, the best way to stop the reaction is by use of Epinephrine. According to him, Epinephrine was his right arm in the treatment of patients with allergic reaction. In most cases in which he observed its use successfully, he felt it was because the doctors were on top of the situation and, therefore, able to administer the drug very soon after the onset of the reaction. He felt, however, that after thirty minutes passes, "fixed" edema sets in and drugs will not work to reverse it. To support this theory, Dr. Moore relied on the fact that at this point there would be destruction of blood vessels along with the "fixed" edema and without the blood vessels the Epinephrine could not reach the edema. He himself had experienced a situation of "fixed" edema which was not aided

by administration of Epinephrine. Once again, the Court notes that Epinephrine was routinely given, nevertheless. In addition to the previous opinion, Dr. Moore also felt that Epinephrine was contraindicated in this case. He pointed out that the Physician's Desk Reference indicates that Epinephrine should be used cautiously with persons who have high blood pressure. He himself had a standing rule not to administer Epinephrine if the pulse rate was 140 or over or the blood pressure was 150 over 100. He felt here that Mr. Wright was so short of oxygen already, from the description given of him, that giving Epinephrine and stimulating the heart would create a greater need for oxygen. His conclusion was, however, that he would not argue with a doctor who had given Epinephrine because students are taught in medical school that Epinephrine is usually given in similar situations. Moreover, he admitted to using Epinephrine on asthma patients with high blood pressure and even on some who were also cardiac patients, but administered very cautiously. With respect to the intubation, he also agreed that it was the correct procedure to attempt because of the advantage to the patient if the procedure had been successful.

Dr. Norman McSwain, instructor in the Surgery Department of Tulane University Medical School and, in this capacity, also in emergency medicine at Charity Hospital, testified for defendant too. He considered his specialty traumatic surgery. As was true with the other doctors, Dr. McSwain was of the opinion that Epinephrine is the drug of first choice and is a lifesaving drug in the face of acute reactions such as acute laryngeal edema. Epinephrine should be used on someone with a relatively severe problem, one which appeared to be developing into respiratory arrest in about fifteen to twenty minutes. He estimated that intravenously administered Epinephrine works in a couple of minutes. However, although he could not think of a situation where Epinephrine would not affect laryngeal edema, he could imagine situations where it would not affect it fast enough to

improve a patient's ability to move air. Moreover, Dr. McSwain was of the opinion that it was a judgment call whether to give Epinephrine based on how rapidly the patient might develop complete laryngeal edema because, as a cardiogenic which speeds up the heart rate, the use of Epinephrine carries a risk.

### Was the Standard of Care Breached?

■ As previously stated, plaintiffs had the burden of proving that the doctors involved in treating Mr. Wright failed to exercise that degree of care and to possess that degree of knowledge or skill ordinarily exercised by physicians within their medical specialty. Returning to the specific acts of negligence which plaintiffs alleged and sought to prove, the first was the failure of Dr. Lutz to administer the drug Epinephrine in fractioned dosages to Mr. Wright upon admission and examination at the VA Hospital. In reviewing all of the evidence with respect to the administration of a drug, this Court is convinced that the proof preponderated, even from defendant's doctors themselves, that it was commonly taught and known that the drug Epinephrine was the drug of first choice and the one that should have been given to Mr. Wright. It could have been given in place of Decadron, which was given, and even Dr. Lutz has stated that he knew of no reason why it should not have been, that in his opinion it was not contraindicated, and that it was not given because, in essence, he did not think to give it. It appears that if it had been given and if the desired effect had occurred, the swelling of Mr. Wright's vocal cords could have been reduced within a short period of time. In that event, the intubation might have been successful before the cessation of breathing. Since we do not wish to be in the position of second guessing a physician, we note that several witnesses felt that the decision was up to the doctor's best judgment. However, it has been pointed out that this is not an appropriate standard, since "... a standard which only requires the physician to use his best judgment is no standard at all." Downs v. American Employers Insurance Company, 423 F.2d 1160, 1163 (5th Cir. 1970). In concluding that this drug was mandated in this situation, we have found from the facts that the plaintiff, Mr. Wright, was diagnosed by Dr. Lutz to be experiencing laryngeal edema caused by an acute allergic reaction at the time he was admitted to the VA Hospital. Given this diagnosis, we find that all doctors agreed, both those for plaintiffs and those for the defendant, that the usual treatment for this condition was to immediately administer the drug Epinephrine intravenously to the patient.

■ The remaining allegations of negligence deal with the emergency room procedures performed on Mr. Wright by Dr. Jones. With respect to them, we find that plaintiffs seek either to apply too high a standard or to completely disregard the fact that this was an emergency situation involving a very difficult patient. They complain that it was improper to perform an attempted intubation on a patient in a sitting position. Aside from the fact that several of defendants' doctors testified to having done the procedure on a patient in this position, it was also made clear that Mr. Wright was too large to move to a litter and was so combative that if the attempt had been made it would probably have taken longer than the attempts at intubation. Moreover, subsequent to the trial, it was submitted on behalf of the plaintiffs that an emergency tracheostomy can be performed by persons with absolutely no training at all, on one hand, and that Dr. Adriani's opinion should be accepted on the proper manner of intubation since he, by estimate, had intubated ten times more patients than all government witnesses collectively. As to the first part, we think that the evidence is exactly to the contrary since all witnesses agreed that this was a difficult tracheostomy. With regard to the manner of intubation, a doctor need only exercise that degree of skill ordinarily exercised or possessed by doctors in a medical specialty. Plaintiffs, having convinced the Court that their witness is exceptional and outstanding in his field, cannot hold Dr.

Adriani out as being the ordinary physician in his area. We are convinced that Dr. Jones was not proven to be negligent with respect to either the intubation or the tracheostomy of Mr. Wright. In addition, we do not find that plaintiffs proved that there was negligence with respect to the size of the endotracheal tube used or in the failure to have an ambu bag available in the admit room of the VA Hospital. With respect to the tube, there is no convincing evidence that the size of it was improper. As to the ambu bag, if we believe defendants, it was not needed and if we believe plaintiffs, it would have done no good in preventing damage to Mr. Wright's brain had it been available and used. Dr. Lutz was the only person who had been in the emergency room at the time who subsequently felt that an ambu bag was needed. As stated by Dr. Jones and as this Court has found, Mr. Wright started to ventilate voluntarily, and there was no need for an ambu bag. On the other hand, there is plaintiffs' position that he did not and that the tracheostomy procedure employed by Dr. Jones was inordinately long. They posture that it took twelve minutes, at least, and that Mr. Wright was not breathing during this time. This would mean, however, that the damage to Mr. Wright would have occurred before the end of the procedure since the weight of the testimony was to the effect that brain damage will occur within three to five minutes after respiratory arrest occurs. Since the Court is not of the opinion and does not find that the weight of the evidence supports the position that Dr. Jones took too long to perform the tracheostomy under the existing conditions, we do not find that he was negligent in this respect or that the ambu bag was needed.

We note that at least one other court has recently dealt with this problem of proper medical treatment in the face of an allergic reaction to penicillin. *See Daniels v. Hadley Memorial Hospital*, 566 F.2d 749 (D.C. Cir.1977), a case in which the deceased had suffered an anaphylactic reaction to an injection of penicillin followed by a similarly fast and furious emergency resuscitation attempt. There, the district court was able to reconstruct more accurately the approximate sequence of events because a minute-by-minute recordation of the procedure was kept by the nurse in charge of the emergency room. However, in our situation, this information was documented from memory after Mr. Wright had been treated, and this Court has not been able to completely reconstruct the sequence of even exactly what transpired. Where there have been gaps, we have attempted to draw the fairest conclusions as possible from the witness' testimony. On the basis of our conclusions, we find that it was a breach of duty not to administer an intravenous injection of adrenalin (Epinephrine) to Mr. Wright as soon as possible.

### Causation

The final issue for our determination at this stage of the trial is whether the negligence of the doctor in failing to administer the proper drug was the proximate cause of the physical damage to Mr. Wright which occurred during his emergency treatment at the VA Hospital. Under Louisiana law, the plaintiffs have the burden of proving by a preponderance of the evidence that the damage to Mr. Wright was more likely caused by defendant's fault than not. *Thompson v. United States*, 368 F.Supp. 466, 469 (W.D.La.1973). " 'To meet the burden of proof required in civil cases, the circumstantial evidence need not negate all other possible causes, it need only prove the causal relationship be more probable than not. Further, the breach of duty need not be shown to be the sole cause of the injury; it is a cause—in fact of the harm to another if it was a substantial factor in bringing about or not preventing the harm that the duty was intended to protect against. *Vonner v. State Dept. of Public Welfare*, La., 273 So.2d 252, 255 (1973).' " *Thompson, id.*, with citations omitted.

In order to negate causation, defendant's expert witnesses have attempted to show that either the use of the drug would not have helped plaintiff or that it would have caused additional problems because, given the condition of plaintiff, its use was con-

traindicated and would have had disasterous effect on his heart. We do not think that defendant's evidence prevails on either of these two points. First, where there is literature to the effect that the drug Epinephrine can have side effects in certain cases, there is no indication that its use is prohibited, only an admonition that it should be used cautiously. As to the theory that the drug will have no effect on a patient whose allergic reaction is too far advanced, i. e., one where there is "fixed" edema, we are not convinced that there is any medical support for this position. We are especially reluctant to place much credence on it in the face of the evidence that even in situations where there was every indication, much as there was here, that the patient would not be receptive to it, the defendant's witnesses, nevertheless, had administered Epinephrine in every case which they detailed. Their patients at least had the chance which Mr. Wright was denied. Moreover, in addition to the testimony of Drs. John Taylor and Richard W. Levy, two highly qualified doctors who also testified on behalf of the plaintiff, to the effect that the drug of choice in this case was Epinephrine, Dr. Adriani testified that it is a virtual certainty that the drug will work. He claimed that, in his experience, the drug worked 99 out of 100 times. We note that even Dr. Clay testified that it worked at least 80 percent of the time. In the face of this testimony, the question now is with what degree of certainty do plaintiffs have to prove that the damage to Mr. Wright resulted from the negligence involved in not administering the drug.

In 1966 the Fourth Circuit decided a case which established a line of cases dealing with the degree of certainty to which a plaintiff must prove causation in malpractice actions. *Hicks v. United States*, 368 F.2d 626. In *Hicks*, it was determined that a doctor, on duty at a naval base dispensary, who had not performed an examination in accordance with the accepted medical standard on a patient who subsequently died of intestinal obstruction was negligent. It was then held that the inadequate examination which resulted in an er-

roneous diagnosis created liability. In so holding, the court stated that: "If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass." (at 632.) In discussing the *Hicks* decision and the cases which followed it, the court in *Daniels, supra* at 757, points out that these decisions ". . . illustrate that there are at least two important factors relevant to the issue of causation in cases involving negligent treatment of a potentially fatal condition: first, the patient's *chances of survival* if properly treated according to medical procedures generally recognized as appropriate under the circumstances; and second, *the extent to which the patient's chances have been reduced* by improper departure from these established procedures." (Emphasis in the original.) The question which this Court then asks itself is to what extent the defendant has interfered with these chances. In *Voegeli v. Lewis*, 658 F.2d 89 (8th Cir. 1977), a medical malpractice suit had been brought alleging that negligence on the part of the treating doctor and hospital resulted in the amputation of plaintiff's leg. In defining proximate cause, where there was conclusive proof of the doctor's negligence, the court in *Voegeli* determined that it was necessary for plaintiffs to prove by a preponderance of the evidence that such negligence ". . . operated substantially to reduce the chances . . ." of saving the plaintiff's leg. At 94. However, although the court recognized that the expert testimony placed the possibility of saving the leg within a period of three to ten hours with a low success rate even during that period, it held that the evidence on proximate cause was not conclusive and, therefore, apparently susceptible to a difference of opinion. The court cites *Hicks* and *McBride v. United States*, 462 F.2d 72 (9th Cir. 1975). The issue in the *McBride* case was whether plaintiffs' proof had shown the essential causal connection between nonadmittance of the decedent to the

coronary care unit, after he was examined in the hospital's emergency room, and a subsequent fatal heart attack shortly after he reached home. On the uncontradicted opinion of one doctor that the decedent's chance of living would have been improved at least 50 percent by admission to the hospital, the court held, at 75:

"When a plaintiff's cause of action rests upon an allegedly negligent failure to give necessary treatment, he must show, with reasonable medical probability, that the treatment would have successfully prevented the patient's injury. He need not prove with certainty that the injury would not have occurred after proper treatment. [Footnote citing to *Hicks v. United States, supra.*] In most situations the best medical treatment in the world cannot provide an absolute guarantee of success; medicine is not an exact science in that sense. Yet the absence of positive certainty should not bar recovery if negligent failure to provide treatment deprives a patient of a significant improvement in his chances for recovery. We think the plaintiff demonstrated the requisite reasonable medical probability in this case."

Although we have found no Fifth Circuit or Louisiana cases which follows the *Hicks* decision, the decision was discussed with approval by the Fifth Circuit in *Bender v. Dingwerth*, 425 F.2d 378, 383–4 (1970), although it was found to be inapplicable to the facts before that Court. And, although none of the cases are decided under our governing law, which is that of the State of Louisiana, all cases cited deal with the question of how to apply the same general standard. All deal with the question of how to prove whether the doctor's negligent act was in fact a cause of the result in a certain type of medical malpractice suit.

As a court sitting without a jury, we have found that the failure to administer the proper drug to Mr. Wright constituted negligence in that such treatment fell below the generally accepted standard of care. We must now decide whether plaintiffs' proof has shown the essential causal connection between that failure and the resulting brain damage to plaintiff Mr. Wright. Based on the estimates of the chance of the drug Epinephrine working to reduce swelling in a given number of patients, plus our disinclination to accept the theories that it was either contraindicated or totally useless because of the given state of edema in this patient, we conclude that these plaintiffs have demonstrated the requisite medical probability that the administration of the proper drug would have prevented Mr. Wright's injury. The weight of the evidence was that he could have been successfully treated at the point he arrived at the hospital. However, without the intravenous injection of Epinephrine, the swelling was not reduced or bypassed in time to prevent Mr. Wright from experiencing respiratory failure long enough to sustain brain damage.

It is now appropriate for the Court to proceed with this trial on the issue of damages.

*Damages*

On March 3, 1980, this Court rendered its decision on the liability portion of this malpractice suit and found the United States liable to plaintiff for the injuries he received as an emergency patient at the Veterans Administration Hospital in New Orleans. Thereafter, a trial was held on the issue of damages. There is no question but that plaintiff, Harold Otis Wright, is a spastic quadriplegic as a result of brain damage he suffered at the Hospital, and that he is totally and permanently disabled. In addition to the quadriplegic condition which is accompanied with generalized spasticity, he has some degree of blindness and an inability to speak above a labored, monosyllabic speech level. He spends his time in a constantly flexed position, either in a wheel chair over which he has no control or in a hospital bed. He is physically dependent on others for absolutely every human activity. Plaintiff was 31 years old when he became disabled. At that time he was married, the father of four children, and the sole family supporter. Plaintiff had been employed as a sales-deliveryman for an industrial laun-

dry service. Prior to the damage to his brain, he had no physical impairments or disabilities. Although it appears now that Mr. Wright is aware of and pained over his condition, at times he does exhibit a childishly happy demeanor. It has been determined that he is better off at home, receiving home-based health care, than at a nursing facility, and the family seems to have adjusted to his condition. However, at this time, the entire burden of providing for home nursing, physical therapy and the daily needs of Mr. Wright have fallen on his wife. She feeds, bathes and clothes him, changes his position, gives him medication and changes his catheter and deals with his bowel problems.

 It is well settled that the components and measure of damages under the Federal Tort Claims Act are as provided by the law of the state where the tort occurred, which in this case is the law of Louisiana. *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir. 1979). Plaintiff seeks to recover: (1) loss of past and future earnings; (2) cost of future nursing care; (3) cost of future medication and medical supplies; (4) cost of future medical tests and hospitalization; (5) cost of future physician and therapist fees, plus accompanying transportation costs; price of a customized van; and (6) the cost of an intensified rehabilitation effort. We think that, if proven, a successful plaintiff is entitled to such special damages under Louisiana law as itemized. *Barrois v. Service Drayage Company*, 250 So.2d 135, 148 (La.App. 4th Cir. 1971), loss of past and future earnings, actual medical *and related expenses; Nichols v. Hodges*, 385 So.2d 298 (La.App. 1st Cir. 1980), physical therapy, licensed practical nurses; *Dupas v. City of New Orleans*, 361 So.2d 911, 915 (La.App. 4th Cir. 1978), rehabilitation expenses, therapy; *Cobb v. Insured Lloyds*, 387 So.2d 13, 19–20 (La.

App. 3d Cir. 1980), future medical expense. Generally, an injured party should be able to recover for damages which resulted directly from defendant's wrongful act so long as they are not speculative. *Caron v. United States*, 410 F.Supp. 378, 392 (D.R.I. 1976).

In addition to the foregoing special damages, plaintiff seeks general damages. Under Louisiana law, general damages are defined as "those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or lifestyle which cannot really be measured definitively in terms of money." *Boswell v. Roy O. Martin Lumber Co., Inc.*, 363 So.2d 506, 507 (La.1978); *Anderson v. Wilding Testing Laboratory, Inc.*, 304 So.2d 351 (La.1974). Plaintiff is asking for a total of $1,866,-918.41 in special damages and an award in general damages in excess of $2,000,000.[1] The government objects to some items of special damages and suggests a much lower amount for general damages. Since we are required to itemize our findings and conclusions as to damages, pursuant to F.R.Civ.P. 52(a), we will discuss the conflicting views along with the itemization. *Ferrero v. United States*, supra at 514.

*Special Damages*

(1) *Loss of Past and Future Earnings*

 Plaintiff offered evidence as to the wages which he was earning at the time he was injured and also evidence as to how the wages for that same work has increased. Defendant did not take issue with this evidence and the Court is willing to accept the figures as given. The difference in the amounts put in evidence by the parties was due, mainly, to the exclusion or not

1. Plaintiff's original complaint sought damages in the total amount of $2,650,000. However, prior to trial, plaintiff moved to amend the complaint to request $5,510,000 in damages, both general and special. The first amount conforms to his original administrative claim under the FTCA and the government argues that plaintiff cannot recover in excess of the amount originally claimed under 28 U.S.C. § 2675(b), which provides that "[a]n action under [the FTCA] shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency...." It, therefore, argues against allowing the amendment. However, in view of our final decision, we find it unnecessary to address this issue in this case.

of income taxes. Both sides factored in a discount rate of 7.625% and a 6% inflation figure. We think that plaintiff should be awarded an amount for past and future lost wages which reflects income net of income taxes and, therefore, award him $93,413 for past wages and $291,283.80 for future wages. In addition, plaintiff put on evidence as to loss of fringe benefits in the total sum of $17,506, figured with the same discount and inflationary considerations. In light of these amounts, total compensation for past and future income losses will be awarded at $402,202.80. We have adopted amounts which are net of taxes because we are of the opinion that this is required by the weight of the law of Louisiana. *Hardie v. Pyland*, 375 So.2d 189, 195 (La. App. 2d Cir. 1979); *Lalonde v. Weaver*, 360 So.2d 542, 546 (La.App. 4th Cir. 1978); *Teal v. Allstate Ins. Co.*, 348 So.2d 83, 86 (La. App. 4th Cir. 1977); *Potts v. Hollier*, 344 So.2d 70, 72 (La.App. 4th Cir. 1977); *Edwards v. Sims*, 294 So.2d 611, 616 (La.App. 4th Cir. 1974); but, see, *Reeves v. Louisiana and Arkansas Railway Co.*, 304 So.2d 370, 376–377 (La.App. 1st Cir. 1974). With respect to the consideration of inflation, it is clear that in Louisiana the trier of fact may consider the decreasing value of the dollar in determining damages. *Murphy v. Georgia-Pac. Corp.*, 628 F.2d 862, 869 (5th Cir. 1980). However, the bottom line in computing an award of damages for loss of wages, under Louisiana law, is that there is no mathematical certainty and, after weighing the considerations, the court is still left to sound judicial discretion. *Mac-Farland v. Illinois Central Railroad Co.*, 127 So.2d 183 (La.1961).

### (2) Cost of Future Nursing Care

It is generally agreed that Mr. Wright can best be cared for at home rather than in a nursing home. Plaintiff is requesting, therefore, 16 hours of nursing care a day for the duration of his full life expectancy of 34 years. No assistance is requested for the eight-hour period when Mr. Wright would presumably be asleep. The evidence presented by plaintiff indicated that for appropriate nursing care during a week period, it would cost $796, or the sum of $41,433.60 over a year. The $796 represents a shifting of licensed practical nurses who are able to give medication, at $11.75 per hour, to nurse's aides, at $5.85 per hour, during periods when medication need not be given. The Court is of the opinion that plaintiff's designation of the type and amount of nursing care which will be required at various times is reasonable. Based on the cost of future nursing services required by Mr. Wright, and again figuring in a 6% inflation figure and a 7.625% discount rate, the Court will award the total sum of $1,029,720 for this element of special damages.

The defendant objects to any award for this item. It takes the position that Mr. Wright is not entitled to any award for future nursing services under Louisiana law. The government bases this position on the case of *James v. State*, 154 So.2d 497 (La.App. 4th Cir. 1963), in which the court refused to award damages to a wife for nursing services which she had performed for her husband and for those which she would perform in the future. The decision is purportedly based on the Louisiana Civil Code, LSA–C.C. Art. 119, which provides that "husband and wife owe to each other mutually, fidelity, support and assistance." It was felt that a wife should not be compensated for performing normal marital obligations. However, in 1970 the same Louisiana appellate court held that when one spouse becomes incompacitated and the other terminates employment to care for that spouse, the tortfeasor will be liable for the lost wages caused by the employment termination. *Berry v. Gulf Coast Construction Company*, 229 So.2d 368, 372 (La.App. 4th Cir. 1970). To the same effect, see *Mays v. American Indem. Co.*, 365 So.2d 279, 285 (La.App. 2d Cir. 1978). In both of these cases, it was the wife who was reimbursed for actual wages lost and loss of future wages when she terminated her employment to stay home and care for her husband. In our case, although Mrs. Wright was not working at the time of her husband's injury, she did testify that she had

attempted to work after her husband became disabled but found it impossible without help and had to quit. We could project from this wages which she lost and will lose in the future while caring for her husband. However, we do not believe that Louisiana law requires this. Again, the same Louisiana appellate court that decided the *James* and *Berry* cases, in 1975 decided the case of *Morgan v. Liberty Mutual Insurance Company*, 323 So.2d 855 (La.App. 4th Cir.) It involved a suit brought by a husband and wife to recover for injuries the husband sustained in an industrial accident which rendered him paraplegic and mentally incompetent. Although the court, on appeal, adjusted the amount which had been awarded for lifetime nursing services, it did permit the sum of $52,000 per year, the amount required for nursing services at home for 22 of the 24 hours each day. The total awarded over his life expectancy of 17.4 years was $837,305.32. Although mention was made of plaintiff's wife several times in the court's opinion, the court accepted the fact that plaintiff-husband was receiving professional nursing care at the time of trial and that he would need it in the future without commenting on any duty to care which his wife might owe him. There was no attempt to tie the wife to a husband who the court described as "a brain damaged, bed-ridden invalid" who would be "an invalid for the rest of his life." To hold otherwise, as the defendant would have it, would in effect put the tortfeasor in the position of a third-party beneficiary of the duty of spouses to care for each other imposed by Louisiana law to the detriment of the innocent spouse. There is no indication in this later case that this is the present posture of Louisiana law. Moreover, it should be emphasized that this award is not to compensate a wife for future nursing services she will perform. It is to provide an injured person with the money he will have to expend to hire someone to do the things for him which he would have been able to do for himself or which would not have to be done at all but for the negligence of the party responsible for his injury.

### (3) *Cost of Future Medication and Medical Supplies*

Testimony was elicited describing medication which Mr. Wright will be on for the remainder of his life, and its projected cost, and certain supplies which are used daily by a person in Mr. Wright's condition, and the projected cost of them. The amount requested by plaintiff for these items, at their present value, is $28,155. This amount includes the sum of $250 per year for four wheelchair replacements over Mr. Wright's life expectancy, computed at a cost of $1,000 each. The government has stated, after trial, that in addition to having supplied Mr. Wright with the wheelchair he is now using, they will continue to provide him with replacements in the future. There was no evidence as to this fact regarding future replacements at trial. However, if there is an obligation on the government to supply this item when necessary, we will be willing to reduce the total for this item of damage by the appropriate amount.

### (4) *Cost of Future Medical Tests and Hospitalizations*

Plaintiff's economist computed the amount of $20,702.41 as the sum which would be necessary to compensate Mr. Wright for laboratory tests which he will need to take on an ongoing basis due to his physical condition. This amount also takes into account the same inflationary factor and is reduced to present worth. Since this item, as the foregoing, goes to offset medical expenses related to plaintiff's condition, we agree that it is a proper element of damages and will award the sum requested.

### (5) *Cost of Future Physician and Therapist Fees (plus accompanying transportation costs and price of a customized van)*

There was testimony to the effect that due to his physical condition, Mr.

Wright will require medical and dental care over and above that which he would have required as a normal person. In addition to testimony as to the amount of dental, urology and pulmonary expenses, plaintiff presented testimony from a licensed physical therapist as to Mr. Wright's continuing need for physical therapy. This therapy is to include an immediate intensified program, followed by therapy related to specific short-term goals, such as reducing spasticity, preventing further deformity and monitoring the effectiveness of the therapy which Mr. Wright will be receiving at home from his family. The government objects to an award of damages to plaintiff for physical therapy because it is argued that Mr. Wright has already reached his maximum point of recovery after rehabilitation provided by the VA. There was testimony to this effect from qualified persons. However, the Court finds the evidence presented by plaintiff more convincing than that presented by the government and also notes, in cases of extreme paralysis, it is not unusual for a court to award damages for future physical therapy. See, e. g., *Nichols v. Hodges*, supra at 303. Moreover, it seems only proper that every effort should be made to make Mr. Wright as comfortable as possible on an ongoing basis. Plaintiff requests $88,959 to compensate for the foregoing items, computed in the same manner as previously described, except using a 10% inflationary factor. The reason for this, as explained by plaintiff's economist, is due to a greater rate of increase in professional fees as compared to other wages. The government did not contradict this evidence. In addition to this amount, testimony established the present value of the transportation expenses involved in obtaining this added medical attention at $142,011, plus an additional $25,000, a reasonable amount to enable plaintiff to purchase a vehicle which will accommodate his wheelchair. The sum of these individual amounts, $255,970, will be awarded as a proper element of damages.

(6) *Cost of an Intensified Rehabilitation Effort*

Plaintiff presented evidence indicating that it would cost approximately $34,200 for a thorough re-evaluation of Mr. Wright at a special rehabilitation center, where he would be treated for an established period of time with physical, occupational and speech therapy at their most advanced stages to finally guarantee that Mr. Wright has the opportunity to reach his maximum level of recovery. The government objects to this item of damage for the same reason it objected to an award for physical therapy. It presented evidence to the effect that Mr. Wright has "plateaued" and cannot make any further progress in his condition. Once again, however, in view of the fact that plaintiff's evidence was to the effect that there is always a chance, even though small, that there may be a little more progress, we think that Mr. Wright should have this last chance. There was sufficient evidence to warrant this award of $34,200.

*General Damages*

In seeking general damages "in excess of $2,000,000," plaintiff has compared Mr. Wright's catastrophic loss to that of the plaintiff in *Griffin v. United States*, 351 F.Supp. 10 (E.D.Pa.1972), who was awarded the sum of $1,200,000 for pain and suffering, and has asserted that since he is worse off he should receive in excess of this amount. It should be added that the $1,200,000 was in addition to $559,945.25 for special damages, for a *total* recovery of $1,759,946.25. Although we note that courts seem to agree that comparison of cases is not an appropriate guide in determining an appropriate amount to compensate for pain and suffering, *Caron v. United States*, supra at 395, each case to stand on its own facts, we think a comparison of other relevant cases may be helpful only for the purpose of putting this issue in a proper perspective. The following cases all represent instances of extreme injury and paralysis. Special and general damages were awarded, by the court, as follows:

| | Special Damages | General Damages | Total |
|---|---|---|---|
| *Trahan v. Girard Plumbing and Sprinkler Co.,* 299 So.2d 835, 842 (La.App. 4th Cir. 1974) | $ 213,816.45 | $200,000 | $ 413,817.45 |
| *Morgan v. Liberty Mutual Ins. Co.,* 323 So.2d at 861 (1975) | 1,127,365.72 | 300,000 | 1,427,365.72 |
| *Caron v. United States,* 410 F.Supp. at 399 (1976) | 156,326.00 | 500,000 | 656,326.00 |
| *Foskey v. United States,* 490 F.Supp. 1047, 1065 (D.R.I.1979) | 1,409,676.61 | 696,000 | . 2,105,676.61 |
| *Nichols v. Hodges,* 385 So.2d at 303 (1980) | 1,408,857.38 | 750,000 | 2,158,857.38 |

All of these courts seem to have followed, in their own mind, the admonition of the Louisiana court in *Morgan v. Liberty Mutual Insurance Company,* supra at 862, that severe injuries should not mandate inflationary general damages. They were, on the other hand, careful to award sufficient amounts to compensate for actual, or special, damages. In considering what to award a severely and permanently injured child for pain and suffering, the court in *Caron v. United States,* supra at 395–396, set forth some useful guides:

I will now consider pain and suffering. The full measure of a tribunal's sound discretion must be employed in assessing a fair amount as damages for the pain and suffering endured and/or to be experienced in the future by the injured party. The amorphous nature of the subject and the infinite variables that come into play make it impossible for the courts to fashion any precise rule. However, the strictures of reasonableness, good sense, nature of the injuries, length of the suffering and the eschewal of sentimentality are guides which assist in determining a fair award.

\* \* \* \* \* \*

I must exercise my discretion and make an award that comports with fairness. In all candor such an exercise is nothing more than the administration of personalized justice. How can it be otherwise when the end product of existing decisional law confesses that the computation of an award for pain and suffering cannot be impersonalized through the formulation of any inflexible rule? As a consequence, what I do here, in the exercise of what I deem to be "sound discretion," has to be a manifestation of my own economic predilections in repairing a harm caused by another's wrong. However else it may be termed, it is nothing more—it is nothing less.

See, also, the same court in *Foskey v. United States,* supra at 1064. In applying this to the facts of our case, we find that we must refuse plaintiff's request. It is meaningless to say that no amount of money can repay this man for the type of life which he now and in the future will endure. Mr. Wright was in court and the Court was able to view this man who has been reduced to an infantile state. However, even an award of an inflated amount of money will not repair this damage. As dispassionately as possible and attempting to be as fair as possible to all parties, the Court finds that $750,000 is as appropriate an amount to award to this crippled man as the Court can fathom.

To recapitulate, the Court awards the following damages:

Special Damages

| | |
|---|---|
| (1) Loss of Past and Future Earnings | $ 402,202.80 |
| (2) Cost of Future Nursing Care | 1,029,720.00 |
| (3) Cost of Future Medication and Medical Supplies | 28,155.00 |
| (4) Cost of Future Medical Tests and Hospitalizations | 20,702.41 |

Special Damages

(5) Cost of Future Physician and Therapist Fees (plus accompanying transportation costs and price of a customized van) $255,970.00

(6) Cost of an Intensified Rehabilitation Effort 34,200.00

General Damages 750,000.00

Total $2,520,950.21

Accordingly,

IT IS THE ORDER OF THE COURT that plaintiff, Harold Otis Wright, be and he is hereby, AWARDED the total sum of $2,520,950.21, as damages in this action.