Suzanne YOUNG and James L. Young, Her husband, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 81–248.

United States District Court, D. Delaware.

Nov. 7, 1983.

Walter L. Pepperman II and Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Jules Fink, Silver Spring, Md., of counsel, for plaintiffs.

Joseph J. Farnan, Jr., U.S. Atty., and Peggy L. Ableman, Asst. U.S. Atty., Wilmington, Del., and William A. Woodruff, Dept. of the Army, Washington, D.C., of counsel, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Chief Judge.

In this medical malpractice action, the plaintiffs, Suzanne Young and her husband, Colonel James L. Young, seek to recover monetary damages from the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for personal injuries and losses allegedly sustained as a result of surgery performed on Mrs. Young on April 15, 1977 at Tripler Army Medical Center ("Tripler") in Honolulu, Hawaii. (Docket Item ["D.I."] 5.) Specifically, Mrs. Young contends that the Army physicians at Tripler were negligent in failing to perform a needle localization biopsy procedure on Mrs. Young's breast and that they failed to obtain Mrs. Young's informed consent to perform a so-called blind biopsy. Colonel Young claims that, as a result of his wife's surgery at Tripler and the emotional and disabling effects, he was injured by the loss of consortium and he was unable to achieve an exemplary efficiency report which precluded his promotion to the rank of an Army General. (D.I. 5; D.I. 69 at 24.)

The action was tried to the Court without a jury in accordance with 28 U.S.C. § 2402 on July 5, 6 and 7, 1983. After carefully considering the sufficiency and weight of the evidence adduced at trial, the demeanor and relationship of the witnesses who testified and the post trial briefs of the parties [1] (D.I. 69, 74 and 75), the Court makes the following findings of fact and conclusions of law as required by Rule 52(a), Fed.R. Civ.P.

## FINDINGS OF FACT

1. The plaintiffs are citizens and residents of Delaware and the causes of action on which this suit is based arose in the State of Hawaii. The defendant is the United States of America. Both plaintiffs filed Standard Claim Form 95 on April 12, 1979, with the Department of the Army and their claims were administratively rejected on December 15, 1980. (D.I. 60 at 2.) This suit was then commenced within six months thereafter on June 9, 1981. (D.I. 1.)

2. At the time of the events which give rise to this action, Mrs. Young was 46 years of age and the wife and dependent of the plaintiff, James L. Young, an Army Colonel then on active duty. (D.I. 60 at 2; Tr. A–26; PX 1–b, p. 1.)[2]

---

**1.** Post trial briefing was completed on October 31, 1983.

**2.** Tr. refers to the three volumes of trial transcripts (D.I. 65, 66 & 67) and will be cited by

letter of volume and page number as follows: "Tr. A–26"; PX refers to plaintiff's physical exhibits and DX to defendant's physical exhibits.

3. In 1972, Mrs. Young experienced chest pains and after being examined by physicians at the Andrews Air Force Base Clinic, her problem was diagnosed as inflammation of ribcage tissue (Tr. A–27; A–77). At the same time the examining physician also detected a lump in her right breast and as a result of follow-up examinations of this condition she was also diagnosed as having fibrocystic breast disease. (Tr. A–27; A–77.)

4. There was a positive history of cancer in Mrs. Young's family; her maternal grandmother died of breast cancer, a paternal grandmother with stomach cancer and a father who died of prostatic cancer. (Tr. A–92 to 95.) Mrs. Young was aware of the significance of this history (Tr. A–94) and was naturally concerned that the cysts caused by her breast disease might be malignant. (Tr. A–78; A–81; A–88.)

5. From the time of the first diagnosis of breast disease, Mrs. Young went through frequent and routine medical checkups at least two or three times a year. (Tr. A–78 to 79; PX 1.) In addition, Mrs. Young also routinely examined herself (Tr. A–28) and made her physician aware as soon as possible of any lumps or masses detected in order to determine whether or not they were malignant. (PX 1.)

6. After 1972, whenever her family was transferred to a new location as a result of her husband's tours of duty, Mrs. Young would associate with a new physician as soon as possible in order to obtain continued monitoring of her breast disease. (Tr. A–78 to 84.)

7. On September 11, 1973, Mrs. Young came under the care of Dr. Woodey, her treating physician in La Plata, Maryland. (Tr. A–28; A–79 to 80.) Dr. Woodey had Mrs. Young undergo xeromammography to confirm the earlier diagnosis of bilateral cystic breast disease. (Tr. A–28.) Mrs. Young continued to follow her condition while under Dr. Woodey's care. (Tr. A–80.)

8. Upon Colonel Young's transfer in 1974 to Carlisle Barracks in Pennsylvania, Mrs. Young was examined and treated by Dr. Fidei and Dr. Stenger and repeat mammograms were taken. (Tr. A–29; A–80; PX 1–b.) These mammograms showed evidence of fibrocystic disease in each breast as well as a suspicious nodular density in the right breast. (PX 1–b.) While Mrs. Young lived in Carlisle for only 13 months, she visited physicians there on at least five occasions for the aspiration of cysts and for monitoring her breast condition. (Tr. A–29; A–87.)

9. In 1975, plaintiffs moved to Seoul, Korea, when Colonel Young was transferred there for a four-year tour of duty. (Tr. A–30; A–80.) While in Korea, Mrs. Young came under the care of Dr. Daniel B. Cavanaugh who on December 8, 1975, performed a biopsy upon her right breast. (Tr. A–31; A–81; PX 1–b, pp. 7–8.) The purpose of that surgery was to assure that the cyst was not malignant. (Tr. A–81.) The cyst proved to be benign and the biopsy left only a minimal scar of a quarter to half inch in size under the right nipple. (Tr. A–31 to 32.) She saw Dr. Cavanaugh at least twice. (Tr. A–87; PX 1–b, pp. 10–11.)

10. Upon Dr. Cavanaugh's transfer to the United States in mid-1976, Mrs. Young came under the care of Dr. Louis Brichta, Chief of General Surgery of the 121st Evacuation Hospital in Seoul, Korea (Tr. A–32; A–81; B–112 to 114), who recommended that Mrs. Young be sent to Tripler for xeromammograms, a more sophisticated form of mammography that was not then available in Korea. (Tr. A–32; A–82 to 83; B–121; B–147.) Mrs. Young returned to the United States in connection with a family matter and while on that trip, on January 13, 1977, she had xeromammograms taken at Tripler. (Tr. A–33; A–83.) The radiologist's report again indicated fibrocystic disease in both breasts. (PX 1–b, p. 17.) The report also indicated one, and possibly two, suspicious areas of microcalcification in the lower, outer quadrant of the left breast, as well as a lobulated mass of a lesser microcalcification, but nevertheless of a suspicious nature. (PX 1–b, pp. 17–18.)

11. After Mrs. Young returned to Korea, Dr. Brichta recommended that she return to Tripler within two months, sooner than recommended originally, for evaluation and management of her abnormal xeromammogram, including repeat mammography. (Tr. A–84; PX 1–b, p. 19.) The evidence shows that Mrs. Young saw Dr. Brichta at least four times prior to April, 1977. (Tr. A–87; PX 1–b, pp. 19–22.)

12. Arrangements were made for Mrs. Young to be med-evaced back to Tripler in April, 1977, because Dr. Brichta was concerned with the possibility of carcinoma. (Tr. B–150.) In his Narrative Summary, provided to aid the surgeons at Tripler, Dr. Brichta listed the diagnosis as "rule out carcinoma of the left breast." (PX 1–b, pp. 21–22.) In addition, he stated therein:

> [I]f indicated, [an] appropriate technique for localization of occult breast lesions as described in the article mentioned [Journal of Surgery, Gynecology, Obstetrics, June 1976, Volume 142, page 197, Dr. Avram M. Cooperman] can be performed. If the occult lesion is identified, the technique for localization and biopsy of this area should be carried out at the treatment facility to which she is going. The newly described techniques for localization of occult breas [sic] lesions are far superior over the old previous wide-blind biopsy techniques that are otherwise required involving extensive removal of breast tissue and consequent deformity of the remaining organ. (PX 1–b, p. 22.)

13. Dr. Brichta testified at trial that his diagnosis clearly signaled the necessity for biopsy and that, "I knew based on the standard medical practice that they would have to do a biopsy, that was one reason why I sent her there." (Tr. B–32.) It was undisputed at trial that a biopsy was the only definitive way to rule out carcinoma. (Tr. A–212; B–125; C–24; C–87.)

14. During the long med-evac trip to Hawaii, Mrs. Young read Dr. Brichta's Transfer Summary and the two journal articles attached thereto which were entitled "Preoperative Localization of Occult Lesions of the Breast"; Cooperman, et al. 142: 917–919, *Surg., Gyn. & Obst.*, 1976 and "Xeromammography—Early Detection of Breast Cancer"; Kalisher, et al., *JAMA*, 234: 60–63, 1976. (PX 15 & 16.) Mrs. Young testified she was thoroughly familiar with the information contained in those documents. (Tr. A–99.)

15. After a long and tiring trip, Mrs. Young arrived at Tripler only to be told at the hospital admission desk that she was not expected (Tr. A–39) and she, through her husband in Korea, made other arrangements for that night. (Tr. A–39 to 40.) These combinations of factors were highly upsetting to Mrs. Young (Tr. A–141 to 142), and as a result, Dr. Roger Hall, Assistant Chief of Thoracic Surgery and a member of the general surgery staff at Tripler, was dispatched to consult with her on April 7, 1977. (Tr. A–141 to 142.) At that time, Dr. Hall obtained a history, reviewed the clinical records, mammography report, and transfer summary, and evaluated her mammograms. (Tr. A–143 to 147.) After considering the suspicious xeromammogram report, his own physical examination of plaintiff, her family history, and the great distance from which she had travelled, Dr. Hall felt that a biopsy was indicated, specifically to set plaintiff's mind at ease regarding potential malignancy. (Tr. A–149.)

16. At this first consultation with Dr. Hall, Mrs. Young expressed her desire for the use of a technique known as the needle localization technique which was described in the literature provided by Dr. Brichta. (Tr. A–152 to 156.) Dr. Hall's initial reaction to the use of this technique was encouraging (Tr. A–155), but he indicated to Mrs. Young that, since it was a radiological procedure, and since it had not previously been used at Tripler, he would have to discuss the possibility of using it in Mrs. Young's case with other members of the staff. (Tr. A–155 to 159.)

17. After discussing the use of the needle localization technique with members of the radiology staff at Tripler, Dr. Hall was advised that the technique would not be particularly helpful in Mrs. Young's case and that other factors existed which led

them to reject its use. (Tr. A–155 to 159.) The radiologists were confident that they could locate the lesions through the use of measurements and landmarks. (Tr. A–158.) Furthermore, the potential for the needles to dislocate, the risk of infection, and the radiologists' lack of experience with the technique made them reluctant to use it in this instance. (Tr. A–156 to 157.) Dr. Hall concluded that it was not the routine practice in any of the other teaching hospitals in Honolulu, since it had never been mentioned in his frequent contacts and interrelationships with other hospital staff members. (Tr. A–157 to 158.) Dr. Hall recalled discussing the decision not to use the technique with Mrs. Young in great detail on the afternoon when he first examined her. (Tr. A–159.) The handwritten surgical note prepared by Dr. Hall documents this first meeting and is contained in the out-patient chart. (PX 1–b, pp. 23–24.)

18. On the following morning, Friday, April 8, 1977, Mrs. Young was admitted to Tripler. (PX 1–a, p. 1.) On that day, Mrs. Young was seen by Dr. James Stratton, the chief surgical resident, who was to perform the biopsy. (PX 1–a, p. 9.) Dr. Stratton had achieved the position as the most senior resident within only four, rather than the customary five-year training period, because of his exceptional ability. (Tr. A–169.) Dr. Hall testified at trial that Dr. Stratton was "very talented, very bright, one of the brightest young residents I have ever had the privilege of teaching." (Tr. A–169.) After the patient had been examined, a history taken, and the mammograms reviewed, Dr. Stratton agreed that the x-rays were suspicious for malignancy and that a biopsy was indicated as soon as possible. (Tr. B–180 to 184.)

19. Mrs. Young testified at trial that Dr. Stratton informed her that if cancer was diagnosed as a result of the biopsy, a radical mastectomy would be performed, thereby removing the breast, lymph nodes and surrounding tissue (Tr. A–43), and that the needle localization technique would not be utilized. (Tr. A–44.) However, Dr. Stratton testified that at his initial meeting with Mrs. Young he fully counseled her regarding the risks and complications of her forthcoming surgery and the nature of the intended procedure. (Tr. B–185 to 191.) When asked about the counseling session, Dr. Stratton testified:

> Yes, I told her in graphic detail about the biopsy itself. I drew a picture for her and went on to explain just in graphic detail about the procedure of the radical mastectomy and exactly what that entailed. (Tr. B–185.)

20. With respect to the risks of the biopsy procedure, Dr. Stratton explained that the complications of the biopsy included "infections, bleeding, breast deformities, skin parasthesia." (Tr. B–185.) Indeed, since Dr. Stratton had counseled numerous patients in the past regarding breast biopsies and radical mastectomies, he stated it was routine for him and he always included an elaborate drawing which, in this case, was contained on the back of the consent form which Mrs. Young ultimately signed prior to the surgery. (Tr. B–187; PX 1–a, p. 38.)

21. Dr. Stratton also testified that he specifically discussed with Mrs. Young the technical, logistical, and theoretical reasons why the needle localization technique was not available at Tripler and could not be afforded to her at that time and that she raised no objection. (Tr. B–184 to 185.) The evidence at trial clearly indicates Mrs. Young and Colonel Young, before surgery, were aware that the needle localization technique would not be used in her case, and that it was not available at that particular institution. (Tr. A–42; A–105; A–106; A–109; A–159; A–165; B–185.) Furthermore, plaintiffs were told that the technique of localizing the lesions through the use of measurements and landmarks was fully adequate to assure that the specific tissue encompassing the abnormalities would be removed during the biopsy procedure. (Tr. A–165.)

22. During the course of the counseling session with Dr. Stratton, Mrs. Young expressed her deep concern about cancer. (Tr. B–191; B–192.) She was also curious

about the possibility that, if the lesions were in fact malignant and a radical mastectomy was required, that the cancer may have spread elsewhere in the body, particularly to the liver. (Tr. B–191.) All of Mrs. Young's inquiries related to the prospect of cancer and Dr. Stratton did not recall any questions relative to the biopsy itself. (Tr. B–192.)

23. When Dr. Stratton presented the consent form to Mrs. Young for her signature, she indicated her desire to speak with her husband before consenting to the surgery. (Tr. A–45; B–193.) She was particularly concerned about whether or not she should have the biopsy done separately from the possible radical mastectomy, or if she should have them both done at the same time. (PX 1–a, p. 11.) The surgery was initially scheduled for Monday morning, April 11, 1977, with the condition that it would not go forward unless Mrs. Young had an opportunity to discuss the matter with her husband over the weekend. (Tr. B–194.)

24. Dr. Stratton's handwritten notes of the counseling session are in the hospital records. (PX 1–a, p. 11.) On April 8, 1977, Dr. Stratton wrote, in part, as follows:

Pt. [patient] councelled [sic] re nature of problem. Understands possible diagnoses & necessary treatments for each. Offered By-radical at same sitting, or staged. Questions answered.

Pt. requests time to contemplate various alternatives, especially whether or not to have the radical at the same time as the biopsy. (PX 1–a, p. 11.)

25. Dr. Stratton made arrangements to go forward with the surgery since it was easier to cancel than to schedule it at the last minute. (Tr. B–194.) When plaintiff returned to the hospital on Sunday morning, she indicated that she desired to wait until Colonel Young had arrived in Hawaii before proceeding with any surgery. Dr. Stratton accordingly informed the nurses on the ward that the surgery was cancelled. (Tr. B–194 to 195.)

26. Although cancellation of the surgery had in fact been noted in her chart (PX 1–a, p. 42), junior residents who were unaware of that fact arrived early on Monday morning at Mrs. Young's hospital room to prepare her for surgery. (Tr. A–47 to 48.) Mrs. Young was understandably upset about the mix-up and even began to arrange to leave the hospital. (Tr. A–48.) She was reassured, however, when Drs. Hall and Stratton apologized and explained to her how and why the lack of communication could have occurred. (Tr. A–161; B–196.)

27. While waiting for her husband to arrive from Korea, Mrs. Young was seen each day by Dr. Stratton, who answered various questions which she would raise concerning her situation. (Tr. B–196.) In addition, mammograms were repeated which showed no significant change from the previous January 1977 films. (Tr. B–197; PX 1–a, pp. 27–28.) The radiology report recommended biopsy of both areas of microcalcifications and the lobulated mass. (PX 1–a, p. 28.)

28. Upon Colonel Young's arrival at Tripler, plaintiffs met with Drs. Hall and Stratton on April 14, 1977, and Mrs. Young was recounseled at that time. (Tr. A–163 to 167; PX 1–a, p. 11.) Initially, the surgeons spent some time trying to explain and apologize for the misunderstanding which occurred upon her arrival. The discussion then turned to the significance of the suspicious areas on Mrs. Young's mammograms and the reasons why she should go forward with the biopsy to obtain a definite disposition. (Tr. A–163 to 167.) The conference lasted approximately 30 or 45 minutes. (Tr. A–164.) Moreover, Mrs. Young was told again that the needle localization procedure would not be used and it was explained why the radiologists did not wish to use it in her case and did not believe that it was necessary. (Tr. A–165.)

29. A comparison was drawn between the biopsy she previously had in Korea and the biopsy she was to undergo at Tripler. (Tr. A–165 to 166.) Dr. Hall advised plaintiffs that there would be a similar incision in the area surrounding the nipple to minimize the visibility of the scar. (Tr. A–165

to 166.) He pointed out that there would be an excisional area somewhat similar to the previous biopsy, which had involved an excision of a specific palpable nodule, while in this case the surgeons would attempt to remove a localized area of the breast. (Tr. A–166.) The course of treatment to be followed in the event that cancer was discovered was also discussed. (Tr. A–166 to 167.)

30. The surgeons at Tripler referred to the procedure performed on Mrs. Young as a "blind" biopsy only in the sense that the abnormalities could not be felt and, during surgery, were indistinguishable from the surrounding tissue. The term was not used to characterize a procedure in which no localization of the areas was employed, or in which the surgeons excised blindly. (Tr. C–34 to 35.) In fact, prior to surgery, the surgeons had consulted several times with the radiologists (Tr. B–204 to 205), and relied heavily upon their measurements from Mrs. Young's mammograms for determining the precise area to remove for pathological study. (Tr. B–204 to 205.)

31. At the conclusion of the meeting on April 14, 1977, Mrs. Young signed the Consent Form which is a part of the hospital records. (PX 1–a, pp. 37–38.) The form indicates that the patient understands the nature of the operation to be:

> that Dr. Stratton will remove a segment of the left breast, including the abnormal calcifications. If cancer is found, the entire breast and nipple will be removed with the underlying muscles, as well as the lymph glands in the armpit. If necessary, a skin graft will be taken from the thigh.

In the space for "exceptions to surgery or anesthesia" the word "none" is inserted. The form is dated April 14, 1977, and was signed after two counseling sessions. (Tr. B–199.)

32. On April 15, 1977, biopsy surgery was performed on Mrs. Young's left breast by Dr. Stratton assisted by Dr. Hall. The surgical report characterized the operation as "Blind biopsy, microcalcifications, left breast." (PX 1–a, p. 23.) The pathological report described the specimen as "discoid in shape" measuring "7 × 6 × 3 cm. in diameter." (PX 1–a, p. 23.) Xeromammograms taken of the specimen was said to show microcalcification and the permanent microscopy specimen revealed benign cystic disease. (PX 1–a, p. 23.) Both Dr. Hall and Dr. Stratton were "elated" with the course of the surgery and the fact that the diagnosis was "benign." (Tr. C–18.)

33. Mrs. Young recuperated normally and without complication (Tr. B–202 to 203; PX 1–a, pp. 13–14), and returned to Korea shortly after her surgery. Prior to discharge, Dr. Stratton recommended repeat xeromammograms to be sure that all the microcalcifications had been removed, and that no cancer had been missed, but Mrs. Young refused because she was "apprehensive about too much radiation." (Tr. A–60.)

34. After returning to Korea, Mrs. Young was again treated by Dr. Brichta. (Tr. A–60.) As the surgical wound healed, Mrs. Young developed a deformity in the left breast in the form of a slight lateral indentation in the area where the tissue was removed. (*See* photographs taken in 1979—DX 15 and 16; Tr. A–57.)

35. There is little doubt that Mrs. Young after returning to Korea was emotionally upset with what she deemed was a totally unwanted and unwarranted result of her biopsy surgery. (Tr. A–60 to 61.) She withdrew and refused to perform social functions which she engaged in before as the wife of a Brigade Commander. (Tr. A–61; A–63; A–64; A–65; C–133 to 134.)

36. Emotionally dissatisfied with the scars of the surgery and her firm belief that she is "disfigured and mutilated," this suit was filed.

37. At trial, plaintiffs presented the testimony of an expert witness, Dr. Bruce Brient, a surgeon currently in private practice in Gainesville, Florida. (Tr. B–5.) Dr. Brient testified he specialized in general surgery with a major emphasis on tumor surgery, and is a part-time associate professor at the University of Florida, teaching in the area of surgery and tumor sur-

gery. (Tr. B–5.) His curriculum vitae indicates that from 1978 through 1981 he was on the surgical staff of the Veterans Administration Medical Center where the patient population is characteristically male. (PX 17.) None of his publications relate in any way to the breast or the diseases common to it. (PX 17.) Dr. Brient had never met Mrs. Young nor examined her. (Tr. B–95.) He testified that the failure of the surgeons at Tripler to use the needle localization technique was a deviation from the standard of care (Tr. B–27), and that the use of the technique was simple and free of complication (Tr. B–8; B–18 to 19), even when confronted with numerous journal articles documenting otherwise. (Tr. B–53 to 68; DX 35, 36, 37.) Dr. Brient also stated unequivocally that the needle localization technique was the standard of care when the article describing it was first presented to Dr. Hall at the time Mrs. Young arrived at Tripler. (Tr. B–49.) Dr. Brient maintained this opinion even though he admitted on cross-examination that, while he personally was aware of the technique in 1965 (Tr. B–50), he did not begin to use it routinely until 1977 or 1978. (D.I. 64 at 55.)

38. Dr. Brient further expressed the opinion that employment of the technique would have minimized or eliminated the deformity. This opinion, however, was undercut by Dr. Brient's own description in his deposition transcript of how he performs the procedure, that is by removal of three to five centimeters of tissue around each lesion located by the needle. (Tr. B–81; B–85; D.I. 64 at 56–59.) It was established at trial that the Tripler surgeons actually removed less tissue than would have been excised using Dr. Brient's procedure. (Tr. B–84 to 89.) Dr. Brient nevertheless did concede that the reasonable patient would consent to a biopsy even if she were told that a deformity would result, given the risk of undetected cancer. (Tr. B–48.)

39. Plaintiffs presented no expert radiological testimony despite the fact that a part of the procedure which was required in this case is classified as a radiological technique and generally performed by radiology staff. (Tr. C–49.) Dr. Brient emphasized at trial that he was not a radiologist. (Tr. B–13.)

40. Dr. Bob Winn Gayler, a diagnostic radiologist at the Johns Hopkins Hospital in Baltimore, Maryland and Associate Professor at the Johns Hopkins University School of Medicine (PX 12), was the sole radiologist who testified at trial. He attended the University of Florida Medical School, received his M.D. in 1963, interned at North Carolina Memorial Hospital, did his radiology residency at Johns Hopkins Hospital and has practiced diagnostic radiology there since 1968. (Tr. C–46.) He was board-certified in radiology in 1968 (Tr. C–47), and he and only one other radiologist at Johns Hopkins read xeromammograms regularly. (Tr. C–57.) The patient volume at Johns Hopkins ranges from six to ten per day or about forty per week. (Tr. C–57.) Since he reads approximately half of all the xeromammograms taken at Hopkins, he has been reading approximately twenty a week or one thousand per year. (Tr. C–57.)

41. Dr. Gayler testified that in interpreting xeromammograms he makes suggestions to the surgeons which will reflect his degree of concern about the malignant potential of a lesion and, if indicated, will recommend a biopsy. (Tr. 49.) He further testified that the needle localization technique is but one of several methods of localization and no one standard is universally used. (Tr. C–51.) He personally utilizes the method of measurements based upon landmarks of the breast, such as the chest wall, skin line, and nipple, using the general orientation of a face of the clock divided in quadrants (Tr. C–50 to 51), and that this is the method generally employed at Johns Hopkins. (Tr. C–52.) Only occasionally are needles placed in the breast. (Tr. C–52.) Furthermore, Dr. Gayler rejected the notion that the needle localization technique is simple and free of complication. (Tr. C–52 to 53.) In particular, he noted the disadvantage in exposing a woman to greater radiation since the technique involves a minimum of two additional films.

(Tr. C–52 to 53.) Loss of position and additional psychological trauma were also mentioned as disadvantages of the technique. (Tr. C–53.) Through the use of slides, Dr. Gayler was able to illustrate the degree of difficulty involved in taking mammograms under pressure while needles are in place. (Tr. C–53 to 56.)

42. As to the use of the needle localization technique in Mrs. Young's case, Dr. Gayler testified that it was not, in his opinion, a deviation from the standard of care not to use needles to localize the lesions. (Tr. C–60.) His reading of plaintiff's xeromammograms revealed two areas of microcalcifications suspicious for cancer, and another area of increased density which was of lesser concern, but nevertheless potentially malignant. (Tr. C–60.) He was of the opinion that all three areas should be biopsied. (Tr. C–60; C–78.) Finally, because of the large size of the suspicious areas, Dr. Gayler believed that needle localization would not have been of any benefit either in locating the lesions or in reducing the size of the specimen. (Tr. C–63; C–79.) He testified that the method of localization used by the staff of Tripler conformed to the standard of care with which he is familiar and which he personally utilizes. (Tr. C–64.)

43. R. Robinson Baker, M.D., a surgeon and Professor of Surgery and Oncology at the Johns Hopkins University School of Medicine, also gave expert surgical testimony on behalf of the defendant. (Tr. C–80.) A graduate of Johns Hopkins University Medical School, Dr. Baker received his M.D. from that institution in 1954. (Tr. C–80.) He completed an internship there in 1955 and then served at the National Institute of Health for two years. (Tr. C–80 to 81.) He completed his surgical residency at Johns Hopkins in 1962 and has been on the staff of the Hopkins Hospital and in the Hopkins Medical School since that time. (Tr. C–81.) He is board-certified by both the American Board of Surgery and the American Board of Thoracic Surgery. (Tr. C–81.)

As to the deformity in Mrs. Young's breast, Dr. Baker characterized it as "moderate" and not "frightfully severe" based upon his experience and observations of others post-operatively. (Tr. C–91.) Dr. Baker further observed that, faced with the fear of cancer, most people would accept a number of things, including deformity, in choosing to go forward with biopsy. (Tr. C–92.)

## CONCLUSIONS OF LAW

1. Jurisdiction of this action exists by virtue of 28 U.S.C. § 1346(b) and venue is properly laid in this district. 28 U.S.C. § 1402(b).

2. This action was timely filed in accordance with 28 U.S.C. § 2401(b).

3. The parties agree that the tort law of Hawaii, where the surgery was performed, is applicable to this case. (D.I. 69 at 10; D.I. 74 at 23.)

4. Plaintiff's first contention is that the surgery upon Mrs. Young at Tripler in April, 1977, by defendant's physicians was negligently performed and deviated from the standard of medical care owed to her. Specifically, plaintiffs contend that the doctors failed to employ the needle localization technique to locate and excise suspicious areas of Mrs. Young's left breast and that this was the cause of her resulting deformity and clear proof of negligence.

5. The standard of medical care required of physicians in Hawaii and against which the Tripler Army surgeons' acts must be measured is a standard quite similar to that set forth in the Restatement (Second) of Torts § 299A. It was stated by the Ninth Circuit in *McBride v. United States,* 462 F.2d 72, 73 (9th Cir.1972), as follows:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

*Id.* at 73. *See also Burrows v. Hawaiian Trust Co.,* 49 Haw. 351, 417 P.2d 816 (1966); *Lyu v. Shinn,* 40 Haw. 198 (1953). Thus, proof of malpractice requires proof, among other things, as to the recognized standards of the medical care and treatment in the same or similar communities, in the particular kind of case, determined on the basis of expert testimony, and a showing that the physician negligently departed from these standards in his treatment or diagnosis of the condition of the plaintiff.

■ 6. Applying this standard to the facts of this case, the Court finds and concludes that the plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that the injuries and disabilities suffered by Mrs. Young were occasioned by the failure of defendant's doctors to use and exercise ordinary skill, care, diligence and learning as possessed by physicians in similar communities.

7. The sole basis for plaintiffs' claims is that the surgeons at Tripler departed from the standard of care, and where they contend the fault lies is in the fact that the Tripler doctors did not use the needle localization technique in locating the occult lesions prior to or during surgery. The evidence offered to support this position was the testimony of plaintiffs' expert, Dr. Bruce Brient. He testified that the needle localization technique was a widely used and well-accepted technique which, if it had been utilized at Tripler in Mrs. Young's case, would have led to less of a deformity in her breast. (Tr. B–6.) Accordingly, the standard of care required its use in the challenged surgery. He further posited that it is a very simple procedure, which involves no problem of dislocation and no danger of infection or of exposure to greater radiation. (Tr. B–8.) The Court, however, is unable to accept this testimony at face value.

8. Defendant's experts, Doctors Gayler and Robinson, as well as all the other physicians who testified at trial, refused to elevate the needle localization technique to be the standard of care, or to require its use to the exclusion of other available and more frequently utilized means of localizing lesions. With the sole exception of Dr. Brichta, who merely preferred the technique but refused to impose it on others (Tr. B–131 to 132), all other doctors who testified at trial disagreed with Dr. Brient and believed its use to be of limited value, fraught with complications and distinct disadvantages, and clearly of no benefit and unnecessary in Mrs. Young's case. (Tr. A–159; B–184 to 185; C–63, C–79; C–90.)

9. Neither Dr. Gayler nor Dr. Baker routinely use the technique at Johns Hopkins Hospital, a highly respected medical institution. (Tr. C–52; C–90.) Dr. Gayler has used it very infrequently and rejected Dr. Brient's description of its simplicity. (Tr. C–53 to 56.) He further indicated a host of problems associated with the technique, including needle dislodgement, increased trauma, and excess exposure to radiation. (Tr. C–52 to 53.) Since the procedure is more frequently classified as a radiological technique, his expert testimony as a radiologist stands essentially undisputed.

10. Dr. Baker, Director of the Breast Clinic at Johns Hopkins, has utilized the technique only once, possibly twice, in the 300–400 biopsies he has performed and described it as "terribly unusual." (Tr. C–90.) When asked to comment upon Dr. Brient's position that the standard of care required use of the needle localization technique, Dr. Baker's answer was most emphatic:

Q: In your opinion, Doctor, does the standard of care require the use of such a technique in this particular case?

A: No. I can be very adamant about that. My answer is no, it does not, since we have hardly ever used it, and I don't think we have left any lesions in place.

(Tr. C–92 to 93.) In the large number of cases that he has treated at Johns Hopkins, Dr. Baker has routinely used, and to this day continues to use, the very same method of localization which was utilized by the

physicians at Tripler Army Medical Center in the biopsy performed upon plaintiff Suzanne Young. (Tr. C–85; C–88.) Accordingly, he concluded, without hesitation, that the Tripler surgeons conformed to the standard of care required. (Tr. C–93.)

11. Based on the weight of the evidence in this case, the Court is unable to conclude that the failure to use the needle localization technique by the Tripler surgeons in Mrs. Young's case amounted to medical malpractice. The mode and method used at Tripler was and continues to be recognized as a proper medical procedure. Where among physicians and surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for a physician or surgeon to adopt one such method instead of another. *Harrigan v. United States,* 408 F.Supp. 177, 185 (E.D.Pa.1976).

12. Furthermore, notwithstanding the fact that the Tripler surgeons were not familiar or comfortable with the technique and had no experience with it, their instinctive apprehensions and fear of complications were justified. The disadvantages of the technique were adequately explained at trial, some of which surfaced in the subsequent literature, most notably dislodgement of the needle. (Tr. B–53 to 68; C–63; C–79; C–90.) Dr. Baker emphasized on cross-examination that he still has serious concerns about the considerable amount of radiation that patients receive when needle localization is used, precisely because it is too early to tell its long-run effect. (Tr. C–99 to 100.) Plaintiff herself expressed her fear of increased exposure to radiation by refusal to have additional mammograms taken after the surgery. (Tr. A–60.)

13. In any event, the Court concludes, based upon the credible evidence that because of the location of the suspicious areas within the breast, approximately seven centimeters of tissue had to be removed. (Tr. C–62 to 65; C–89; DX 3, 4, 5, 6, 7, 38 & 39.) The actual size of the biopsy specimen was 7 × 6 × 3 centimeters (PX 1–a, p. 23.) This is the amount of tissue that would have had to be excised to accomplish the purpose of the biopsy regardless of the method used to localize the areas of microcalcification shown on the xeromammograms. The Court, therefore, concludes that the defendant's physicians were not negligent in performing the surgical procedures upon Mrs. Young's breast on April 15, 1977 at Tripler.

14. Plaintiffs, as before mentioned, also contend that the Tripler surgeons breached their duty to advise her of the risks and complications of a biopsy procedure, in that they never told her of the risk of deformity which deprived her of information essential for making an informed choice.

15. Despite Mrs. Young's trial testimony that her physicians never informed her that one of the risks of a biopsy procedure was deformity (Tr. A–120 to 122), the Court finds otherwise and that the risk of deformity was communicated to her prior to surgery. Dr. Stratton testified that, during the first session with her, he expressly enumerated the inherent and potential hazards of the proposed treatment, and deformity was specifically mentioned as one of them. (Tr. B–185.) Since Dr. Stratton had counseled patients with similar conditions in the past, his extensive explanation had become a routine for him and included a detailed drawing contained on the back of the Consent Form ultimately signed by plaintiff. (Tr. B–187 to 192.) At that session, all of the questions raised by Mrs. Young reflected her concern that she may have cancer, and all were fully answered. (Tr. B–192.) While waiting for her husband to arrive from Korea, surgeons who saw her each day answered any further questions which she would pose. At a second counseling session held the day before surgery at which Colonel Young was also present, Dr. Hall outlined once again the procedure and technique to be used in her forthcoming surgery, and the details of the treatment. (Tr. A–163 to 167.) The discussion lasted 30 to 45 minutes. (Tr. A–164.)

16. Mrs. Young testified at her deposition that Dr. Stratton's explanation of the

**582**

proposed surgical procedures and the risks that could ensue was "graphic," "too thorough," "ghoulish," "very detailed," to such an extent that she was frightened. (D.I. 25 at 109–111.) At trial, however, Mrs. Young confined this description only to his explanation of the mastectomy, insisting that he was totally remiss in his disclosures respecting the biopsy. (Tr. A–120 to 121.) The Court is satisfied that Mrs. Young, faced with the possibility of breast cancer and a radical mastectomy, was extremely distraught and may not have appreciated the breadth of the information and appraisal of risks given to her by Dr. Stratton. Thus, after the procedure to which she consented in the presence of her husband, and from which she learned that the tissue was not cancerous, she became emotionally upset due to the deformity. This has undoubtedly blunted her memory as to what she was told at the preoperative counseling sessions. The Court, therefore, finds that the plaintiffs have failed to establish by a preponderance of the evidence that the defendant's physicians failed to inform Mrs. Young of the possibility of deformity and that she was deprived of giving a conformed consent to the surgical procedures.

17. Finally, Colonel Young's claim for the recovery of damages for loss of consortium and for failure to be promoted is derivative of Mrs. Young's claims for medical malpractice. Thus, Colonel Young's ability to recover damages depended upon Mrs. Young's ability to recover on her negligence claims. Because the Court has determined that Mrs. Young may not recover on her malpractice claims, Colonel Young is not entitled to recover on his derivative claim.

18. Finding that the plaintiffs have failed to establish by a preponderance of the evidence that the defendant is legally liable for any damages sustained by plaintiffs, the Court will enter judgment against the plaintiffs and in favor of the defendant.